(No. 27439.—

CHARLES H. REGAN *vs.* THE KROGER GROCERY & BAKING COMPANY, Appellant.—(PRENTISS M. BROWN, Administrator of Office of Price Administration, Appellee.)

*Opinion filed March 21, 1944.*

HENRY J. & CHARLES AARON, (FRANKLIN RABER, of counsel,) all of Chicago, for appellant.

ALEX ELSON, JOHN F. MANIERRE, MILTON M. HERRMANN, and ROBERT B. JOHNSTONE, all of Chicago, (FLEMING JAMES, JR., and DAVID LONDON, both of Washington, D. C., of counsel,) for appellee.

Mr. CHIEF JUSTICE SMITH delivered the opinion of the court:

This is an appeal from a judgment of the municipal court of Chicago. Certain constitutional questions are raised with reference to the validity of an act of Congress, known as the Emergency Price Control Act of 1942.

Charles H. Regan brought the suit, as plaintiff, under said act. In his verified statement of claim, he alleged that on November 19, 1942, he purchased from appellant, the Kroger Grocery & Baking Company, at its retail store in Oak Park, two cans of Campbell's Condensed Asparagus Soup, for which it demanded and collected from him twenty-five cents; that on December 11, 1942, he also purchased from appellant, at the same store, two like cans for which the appellant demanded and collected the sum of twenty-five cents; that these charges were in excess of the ceiling price fixed under said act. He further alleged that on December 14, 1942, he purchased three cans of Campbell's Condensed Asparagus Soup, for which the defendant demanded and collected thirty-eight cents, which was alleged to be in excess of the ceiling price. It was further alleged that the ceiling price for said commodities, established for the store at which they were purchased, under the General Maximum Price Regulation, effective May 18, 1942, was one can for ten cents, two cans for twenty cents and three cans for twenty-nine cents. He alleged that each of said purchases constituted a separate and distinct violation of section 205 (e) of the Emergency Price Control Act of 1942; that he was entitled to recover for each alleged violation the sum of $50, or treble the amount by which the consideration exceeded the maximum price, whichever was greater, plus reasonable attorney's fees and costs. He demanded the sum of $150, plus attorney's fees and costs.

Appellant appeared and filed three separate affidavits of defense. The first defense, after admitting the maxi-

mum ceiling prices fixed, as alleged in the statement of claim, denied that the sales were made and the overcharges demanded and collected, as alleged; it denied that each of the alleged sales was a separate and distinct violation of the Emergency Price Control Act and denied that plaintiff was entitled to judgment. The affidavit of defense further alleged that if such sales were made, at the prices alleged, they were made by its agents or employees, without its knowledge, approval or consent. It set out somewhat in detail the steps it had taken and the instructions which it had given to its store managers and other employees with reference to compliance with the maximum ceiling prices fixed under the act.

The second defense alleged that the plaintiff's cause of action arose under the penalty provisions of the Emergency Price Control Act; that the remedies sought by plaintiff were penal in character; that the courts of Illinois were without jurisdiction to impose a penalty under any law of the United States or of any foreign state or sovereignty, and that such jurisdiction could not be conferred on the courts of this State by congressional enactment.

The third defense alleged that the Emergency Price Control Act is unconstitutional and, in so far as it seeks to control and limit sales of commodities between a retail dealer and consumer in local or intrastate transactions, constitutes an infringement on a power reserved to the States; that it was not a measure necessary to the successful prosecution of the war, within the meaning of the war powers of Congress. It further alleged that the act was invalid because it limits the power of the courts upon which the act attempts to confer jurisdiction to adjudicate controversies arising thereunder, thereby depriving the defendant of the right to interpose all available defenses in such suits and, consequently, deprives the defendant of its property without due process of law.

Thereafter, Prentiss M. Brown, Administrator of the Office of Price Administration, appeared and filed a motion for leave to intervene. He alleged that he was interested in the subject matter of the action and that his interest would be affected by the judgment of the court in said suit; that he desired to intervene as a party pursuant to section 205(d) of the Emergency Price Control Act, section 25 of the Civil Practice Act and rule 20 of the municipal court. He was granted leave to intervene. He thereupon filed a motion to strike the second and third defenses filed by appellant.

The motion to strike these defenses was based on the ground that such defenses were substantially insufficient in law and presented no defense to the action. It was alleged that the municipal court had jurisdiction by virtue of the Municipal Court Act and that said action was not an action for the recovery of a penalty. He further averred that the Emergency Price Control Act of 1942 was a valid and constitutional exercise, by the Congress of the United States, of the war powers conferred upon it by section 8 of article I of the Federal constitution.

Upon a hearing this motion was sustained and the second and third defenses were stricken by the trial court. The cause was thereafter tried on the statement of claim and the first defense, and evidence heard in support thereof. The court found appellant guilty of two violations of the Emergency Price Control Act in making the sales on November 19 and December 11, 1942, as alleged in the complaint. Appellant was found not guilty as to the sale alleged to have been made on December 14, 1942. Judgment was entered in favor of the plaintiff and against appellant, based on the sales of November 19 and December 11, for $100 damages and $20 attorney's fees. Appellant has perfected a direct appeal to this court because of the constitutional questions involved.

The Emergency Price Control Act of 1942 (50 U. S. C. A. par. 901, *et seq.*) contains several sections. Section 1(a) (50 U. S. C. A. 901(a)) declares an emergency. In so far as here material that section reads as follows:

"It is hereby declared to be in the interest of the national defense and security and necessary to the effective prosecution of the present war, and the purposes of this Act are, to stabilize prices and to prevent speculative, unwarranted, and abnormal increases in prices and rents; to eliminate and prevent profiteering, hoarding, manipulation, speculation, and other disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to the national emergency; to assure that defense appropriations are not dissipated by excessive prices; to protect persons with relatively fixed and limited incomes, consumers, wage earners, investors, and persons dependent on life insurance, annuities, and pensions, from undue impairment of their standard of living; to prevent hardships to persons engaged in business, to schools, universities, and other institutions, and to the Federal, State, and local governments, which would result from abnormal increases in prices; to assist in securing adequate production of commodities and facilities; to prevent a post emergency collapse of values; to stabilize agricultural prices in the manner provided in section 3; and to permit voluntary cooperation between the Government and producers, processors, and others to accomplish the aforesaid purposes."

Section 2 (50 U. S. C. A. 902) provides for the appointment of a Price Administrator and provides the processes and procedure to be following in fixing maximum prices of certain commodities, referred to in the act.

Section 202 confers power upon the Administrator to make investigations for the purpose of obtaining information concerning the practices of those engaged in certain businesses, within the meaning of the act. 50 U. S. C. A. 922.

Section 203 provides certain procedures and remedies for the enforcement of the act. 50 U. S. C. A. 923.

Section 204(c) creates an Emergency Court and defines its jurisdiction and powers. 50 U. S. C. A. 924(c).

Section 205(c) prescribes the jurisdiction of courts, other than the Emergency Court, as follows: "The district courts shall have jurisdiction of criminal proceedings for violations of section 4 of this Act, and, concurrently with the State and Territorial courts, of all other proceedings under section 205 of this Act." 50 U. S. C. A. 925(c).

Section 205(d) provides that the Adiministrator may intervene in any suit or action, brought in any court, under the act.

Section 205(e) provides, in part: "If any person selling a commodity violates a regulation, order, or price schedule prescribing a maximum price or maximum prices, the person who buys such commodity for use or consumption other than in the course of trade or business may bring an action for $50 or treble the amount by which the consideration exceeded the applicable maximum price, whichever is the greater, plus reasonable attorney's fees and costs as determined by the court. * * * Any suit or action under this subsection may be brought in any court of competent jurisdiction, and shall be instituted within one year after delivery is completed or rent paid." 50 U. S. C. A. 925(e).

There are four statements of error relied upon in this court for a reversal of the judgment of the court below. Appellant contends, (1) that the Emergency Price Control Act of 1942 is unconstitutional, as alleged in its third defense; (2) that the provisions of the act for the recovery of three times the amount of the overcharge, or a minimum of $50, plus costs and attorney's fees, is penal in character, and cannot be enforced in the courts of this State, as alleged in its second defense; (3) that the sales, if made, were without the knowledge and consent of appel-

lant and in violation of its express directions and without its approval, and (4) that the finding of the trial court and the judgment are contrary to the manifest weight of the evidence.

We will consider these questions in the order of their presentation by appellant.

The constitutionality of the act is challenged, first on the ground that the subject matter of the enactment is beyond the powers of Congress, under the constitution. In the argument it is stated by appellant that the validity of the act is questioned on two grounds, as follows: "So far as it attempts to fix or regulate the prices at which articles of personal property may be bought or sold in purely local or intrastate transactions between individuals, it exceeds any power granted under the constitution. In so far as it attempts to confer upon State Courts jurisdiction to determine and impose the penalty provided in favor of the buyer and against the seller, but denies to such court the power to pass upon the reasonableness of any regulation of the Price Administrator or to pass upon the constitutionality of the Act, it deprives the defendant of the right to interpose legal defenses which would defeat the plaintiff's claim and permits the plaintiff to recover judgment against the defendant on an illegal claim, and thereby, in effect, deprives the defendant of its property without due process, in violation of the Fifth Amendment."

It would seem more logical to discuss these two questions in the inverse order in which they are above stated by appellant. Obviously, if the power to pass upon the validity of the act was denied to the trial court and this court, by the act, then we cannot consider the constitutionality of the act in any respect. Section 204(d) (50 U.S. C. A. 924(d),) among other things provides: "The Emergency Court of Appeals, and the Supreme Court upon review of judgments and orders of the Emergency Court of Appeals, shall have exclusive jurisdiction to determine

the validity of any regulation or order issued under section 2, of any price schedule effective in accordance with the provisions of section 206, and of any provision of any such regulation, order or price schedule. Except as provided in this section, no court, Federal, State, or Territorial, shall have jurisdiction or power to consider the validity of any such regulation, order, or price schedule, or to stay, restrain, enjoin, or set aside, in whole or in part, any provision of this Act authorizing the issuance of such regulations or orders, or making effective any such price sechedule, or any provision of any such regulation, order, or price schedule, or to restrain or enjoin the enforcement of any such provision."

So far as we have been able to ascertain, this section has not been considered by the Supreme Court of the United States, except in *Lockerty* v. *Phillips*, 319 U. S. 182, 63 S. Ct. 1019. In that case the exclusive jurisdiction clause of section 204.(d) was construed only as it applied to suits in equity for injunctions. The court did, however, make the following pertinent observation: "We have no occasion to determine now whether, or to what extent appellants may challenge the constitutionality of the Act or the Regulation in courts other than the Emergency Court, either by way of defense to a criminal prosecution or in a civil suit brought for some other purpose than to restrain enforcement of the Act or regulations issued under it."

From the above language, it would seem that the court felt called upon to make it clear that it did not intend to hold that, in cases other than those brought to restrain the enforcement of the act, courts, other than the Emergency Court of Appeals and the Supreme Court, could not consider the validity of the act. The language of the exclusive jurisdictional clause is not as broad as appellant assumes. We find nothing in that provision which denies to any court the right to consider or determine the validity

of the act, except in equity cases brought to restrain its enforcement. The jurisdictional limitation in the act, except in cases brought to restrain its enforcement, is confined, by express words, to questions concerning the validity of regulations promulgated under the act, as distinguished from questions going to the validity of the act itself. No question as to the validity of any such regulation is involved in this case, if the act is constitutional. The objections are based solely upon the alleged invalidity of the act itself.

It is our conclusion that the provisions of section 204.(d) of the act, vesting exclusive jurisdiction in the Emergency Court of Appeals, and the Supreme Court, apply only to equity cases where the enforcement of the act is sought to be restrained. In all other cases all courts may consider all questions, except the validity of regulations under the act. As we view it, the language used clearly indicates that Congress did not intend to deny to any court, having jurisdiction of an action under the act, the right to determine its validity, except in cases coming within the plain language of the exclusive jurisdictional clause of section 204(d). That this court has jurisdiction to consider the constitutional questions raised is, we believe, self-evident.

There being no decisions of the Supreme Court of the United States on the constitutional questions here raised, it is necessary for this court to determine for itself the validity of the act as against the questions raised on the record.

As already observed, the validity of the act is attacked on the alleged ground that it constitutes legislation on a subject matter not within the powers of Congress. It is argued that Congress has no power to fix or regulate prices at which articles of personal property may be bought and sold in purely local or intrastate transactions between individuals. Standing alone this statement carries conviction. But for the purpose of testing the validity of the act

and determining the powers of Congress, it must be considered in the light of the emergency which Congress has declared in the act itself. (Sec. 1(a), 50 U. S. C. A. 901(a).) In passing the act, Congress purported to act under its war powers. These powers are enumerated in clauses 11 to 16 of section 8 of article I of the constitution, as follows:

"To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water;

"To raise and support Armies, but no Appropriation of Money to that Use shall be for a longer Term than two Years;

"To provide and maintain a Navy;

"To make Rules for the Government and Regulation of the land and naval Forces;

"To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions;

"To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress."

Clause 18 of said section confers the additional power:

"To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

Any investigation as to whether a legislative body has exceeded its powers must begin with the presumption that its acts are valid. Here, Congress declared in the act that it was "in the interest of the national defense and security, and necessary to the effective prosecution of the present

war." It then declared that it was the national policy, necessary to the effective prosecution of the war, to control prices and to take other necessary steps to prevent inflation. Such declaration of national policies must be given weight. The Senate Committee, in its report to the Senate on the bill before it was enacted, described the perils of inflation in the following words:

"Of all the consequences of war, except human slaughter, inflation is the most destructive * * * rising prices and increases in the cost of living to our people cause industrial unrest, and undermine our unity * * * living costs tend to rise more quickly than wages (and) the burdens of war are haphazardly distributed, with the heaviest burden on the farmer, the salaried worker, the small investor, the pensioner, the veteran, whose incomes cannot be readily expanded. Rising living costs mean labor disputes and spiraling wage demands, and the suspicion of profiteering causes discontent which hampers production as surely as the bombing of factories. Rising prices now foreshadow * * * inflation later with attendant depression and suffering. Such prospects and fears * * * sap energy and morale now * * * rising prices inevitably increase the cost of the defense program."

By section 8 of article I of the constitution, Congress is given great latitude in the enactment of legislation born of the emergencies of war. In *Stewart* v. *Kahn*, 11 Wall. 493, 20 L. ed. 176, the court said: "Congress is authorized to make all laws necessary and proper to carry into effect the granted powers. The measures to be taken in carrying on war and to suppress insurrections are not defined. The decision of all such questions rests wholly in the discretion of those to whom the substantial powers involved are confided by the Constitution."

When galvanized into action, in a permissible field, in the program of national defense, the war powers of Congress are, and, of necessity, must be, practically unlimited.

That it is difficult to circumscribe the boundaries beyond which Congress may not go in the exercise of its war powers is manifest from the language of the court in *United States* v. *MacIntosh*, 283 U. S. 605, 51 S. Ct. 570, where it was said: "From its very nature, the war power, when necessity calls for its exercise, tolerates no qualifications or limitations, unless found in the Constitution or in applicable principles of international law. In the words of John Quincy Adams, 'This power is tremendous; it is strictly constitutional; but it breaks down every barrier so anxiously erected for the protection of liberty, property, and of life.' To the end that war may not result in defeat, freedom of speech may, by act of Congress, be curtailed or denied so that the morale of the people and the spirit of the army may not be broken by seditious utterances; freedom of the press curtailed to preserve our military plans and movements from the knowledge of the enemy; deserters and spies put to death without indictment or trial by jury; ships and supplies requisitioned; property of alien enemies, theretofore under the protection of the Constitution, seized without process and converted to the public use without compensation and without due process of law in the ordinary sense of that term; prices of food and other necessities of life fixed or regulated; railways taken over and operated by the government; and other drastic powers, wholly inadmissible in time of peace, exercised to meet the emergencies of war."

The power to wage war permits the harnessing of the entire energies of the people in a supreme effort to preserve the nation. *Home Building and Loan Ass'n* v. *Blaisdell*, 290 U. S. 398, 54 S. Ct. 231.

In *Hirabayashi* v. *United States*, 320 U. S. 81, 63 S. Ct. 1375, the principle was expressed as follows: "The war power of the national government is the power to wage war successfully. * * * It extends to every matter and

activity so related to war as substantially to affect its conduct and progress. The power is not restricted to the winning of victories in the field and the repulse of enemy forces. \* \* \* Since the Constitution commits to the Executive and to Congress the exercise of the war power in all the vicissitudes and conditions of warfare, it has necessarily given them wide scope for the exercise of judgment and discretion in determining the nature and extent of the threatened injury or danger and in the selection of means for resisting it. \* \* \* Where, as they did here; the conditions call for the exercise of judgment and discretion and for the choice of means by those branches of the Government on which the Constitution has placed the responsibility of war-making, it is not for any court to sit in review of the wisdom of their action or substitute its judgment for theirs."

The so-called Lever Act, passed during World War I, a statute quite similar, regulating the price of coal, was considered in *Highland* v. *Russell Car and Snowplow Co.* 279 U. S. 253, 49 S. Ct. 314. It was there said: "There was need of regulation in order to prevent manipulations to enhance prices by those having coal for sale and to lessen apprehension on the part of consumers in respect of their supply and the prices liable to be exacted."

Other cases have sustained, as war emergency measures, statutes authorizing the Government to take over and operate railroads, (*Northern Pacific Railway Co.* v. *North Dakota ex rel. Langer,* 250 U. S. 135, 39 S. Ct. 502, 63 L. ed. 897,) telegraph and telephone systems, (*Dakota Central Tel. Co.* v. *South Dakota ex rel. Payne,* 250 U. S. 163, 39 S. Ct. 507, 63 L. ed. 910,) prohibiting the manufacture and sale of beverages, (*Hamilton* v. *Kentucky Distilleries and Warehouse Co.* 251 U. S. 146, 40 S. Ct. 106, 64 L. ed. 194,) to draft manpower for military service, (*Selective Draft Law Cases,* 245 U. S. 366, 38 S. Ct. 159, 62 L. ed.

349,) and to control rates. (*Block* v. *Hirsh*, 256 U. S. 135, 41 S. Ct. 458, 65 L. ed. 865.) Many other cases announcing the same principle might be cited.

When Congress has once determined that legislation which it has adopted is an appropriate means to a permissible end, it must be sustained as such. In *Virginia Railway Co.* v. *System Federation No. 40,* 300 U. S. 515, 57 S. Ct. 592, it was said: "Even though Congress, in the choice of means to effect a permissible regulation of commerce, must conform to due process, (*Railroad Retirement Board* v. *Alton R. Co. supra,* 295 U. S. 330, 347, 55 S. Ct. 758, 761, 79 L. ed. 1468; *Chicago, R. I & P. Ry. Co.* v. *United States,* 284 U. S. 80, 97, 52 S. Ct. 87, 92, 76 L. ed. 177; see *Louisville Joint Stock Land Bank* v. *Radford,* 295 U. S. 555, 589, 55 S. Ct. 854, 863, 79 L. ed. 1593, 97 A. L. R. 1106;) it is evident that where, as here, the means chosen are appropriate to the permissible end, there is little scope for the operation of the due process clause."

In construing the rent-control provisions of the act here under consideration, a three-judge statutory Federal court used the following appropriate language: "It must follow that Congress has the power to regulate the costs of commodities and facilities in order to insure the essential armaments, prevent defeat and insure victory. * * * If the act is an appropriate means to a permitted end there is little scope for the operation of the due process clause." *Henderson* v. *Kimmel,* 47 F. Supp. 635.

In our opinion, the power of Congress to enact the Emergency Price Control Act is so conclusively established that further discussion could add nothing to what has already been said. The court did not err in striking the third defense. The first statement of error cannot be sustained.

This brings us to the question raised by the second defense, which is presented to this court by the second alleged error. The contention is that the provision of the act

granting to an overcharged customer a right to recover three times the amount of the overcharge, or $50, whichever is greater, plus costs and attorney's fees, renders the act penal in its nature; that an action cannot be maintained in the courts of Illinois to recover penalties imposed by a statute of a foreign jurisdiction. That this rule of law is firmly established by the decisions of this and other courts cannot be doubted. It was so held in the cases cited and relied upon by appellant. It has also been held, as contended by appellant, that the question of whether the remedy granted by a foreign law is penal or remedial in character, must be determined by the court in which the action is brought. *Huntington* v. *Attrill,* 146 U. S. 657, 36 L. ed. 1123.

The difficulty with the attempt to apply that rule to this case is, the Emergency Price Control Act is not a statute of a foreign jurisdiction. The laws of Congress are as much the laws of this State as the enactments of our own legislature. Article VI of the Federal constitution provides: "This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby * * *." Congress has power to confer jurisdiction on State courts. (*The Moses Taylor,* 4 Wall. 411, 18 L. ed. 397; *Stewart* v. *Kahn,* 11 Wall. 493, 20 L. ed. 176.) It also has the power to regulate procedure in State courts in the enforcement of Federal laws. *Clark* v. *Mechanics Nat. Bank,* 282 Fed. 589; *Konkel* v. *State,* 168 Wis. 335, 170 N. W. 715; *Erickson* v. *Macey,* 231 N. Y. 86, 131 N. E. 744.

Language similar to the provisions of the Emergency Price Control Act authorizing suits under the act to be brought in "any court of competent jurisdiction" was construed in the case of *Forsyth* v. *Central Foundry Co.* 240 Ala. 277, 198 So. 706, where it was said: "It seems to

us that when it mentions 'any court of competent jurisdiction' it meant any court authorized by the power that created it to entertain such nature of suits generally." That case was under the Fair Labor Standards Act of 1938. (29 U. S. C. A. 201, *et seq.*) That act provided that actions to recover the amount due an employee who had been paid less than minimum wages, plus an equal additional amount as liquidated damages, could be brought "in any court of competent jurisdiction."

In *State of Missouri ex rel. St. Louis, Brownsville & Mexico Railroad Co.* v. *Keller,* 266 U. S. 200, 45 S. Ct. 47, it was said: "Congress created the right of action. It might have provided that the right shall be enforceable only in a federal court. It might have provided that state courts shall have concurrent jurisdiction only of those cases which, by the applicable federal law, could, under the same circumstances, have been commenced in a federal court for the particular state. But Congress did neither of these things. It dealt solely with the substantive law. As it made no provision concerning the remedy, the federal and the state courts have concurrent jurisdiction. (*Galveston, etc. Ry. Co.* v. *Wallace,* 223 U. S. 481, 490, 32 S. Ct. 205, 56 L. ed. 516.) The federal right is enforceable in a state court whenever its ordinary jurisdiction as prescribed by local laws is appropriate to the occasion and is invoked in conformity with those laws. *Second Employers' Liability Cases,* 223 U. S. 1, 56, 57, 32 S. Ct. 169, 56 L. ed. 327, 38 L. R. A. (n. s.) 44; *Claflin* v. *Houseman,* 93 U. S. 130, 136, 137, 23 L. ed. 833."

It follows that when Congress grants a right and makes no provision with reference to the courts in which the right may be enforced, a suit to enforce such right may be brought in any State or Federal court having general jurisdiction of the class of cases to which the particular action belongs. When the Congress creates a right and provides that the State and Federal courts shall have con-

current jurisdiction of suits to enforce it, such grant of concurrent jurisdiction implies that the plaintiff, in the first instance, shall have the choice of the court in which to bring the action. He is entitled to whatever remedial advantages inhere in the particular forum.

The result is that whether the act be regarded as penal or remedial makes no difference in this case. It is not a law of foreign sovereignty. The Emergency Price Control Act is a law of Illinois and enforceable as such. The courts of Illinois have not been denied jurisdiction by the act. Such jurisdiction has been expressly granted to them, concurrent with the Federal courts.

In *Claflin* v. *Houseman*, 93 U. S. 130, 23 L. ed. 833, it was said: "The laws of the United States are laws of the several States, and just as much binding on the citizens and courts thereof as the state laws are. The United States is not a foreign sovereignty as regards the several States, but is a concurrent and, within its jurisdiction, paramount sovereignty. Every citizen of a State is a subject of two distinct sovereignties, having concurrent jurisdiction in the State; concurrent as to place and persons, though distinct as to subject matter. Legal or equitable rights, acquired under either system of laws, may be enforced in any court of either sovereignty competent to hear and determine such kind of rights and not restrained by its Constitution in the exercise of such jurisdiction. Thus, a legal or equitable right acquired under state laws, may be prosecuted in the State Courts, and also, if the parties reside in different States, in the Federal Courts. So rights, whether legal or equitable, acquired under the laws of the United States, may be prosecuted in the United States Courts, or in the State Courts, competent to decide rights of the like character and class; subject, however, to this qualification, that where a right arises under a law of the United States, Congress may, if it see fit, give to the Federal Courts exclusive jurisdiction. This jurisdic-

tion is sometimes exclusive by express enactment and sometimes by implication. If an Act of Congress gives a penalty to a party aggrieved, without specifying a remedy for its enforcement, there is no reason why it should not be enforced, if not provided otherwise by some Act of Congress, by a proper action in a State Court. The fact that a State Court derives its existence and functions from the state laws is no reason why it should not afford relief; because it is subject also to the laws of the United States, and is just as much bound to recognize these as operative within the State as it is to recognize the state laws. The two together form one system of jurisprudence, which constitutes the law of the land for the State; and the courts of the two jurisdictions are not foreign to each other, nor to be treated by each other as such, but as courts of the same country, having jurisdiction partly different and partly concurrent." To the same effect is *Second Employers' Liability Cases*, 223 U. S. 1, 56 L. ed. 327.

The decision of this court in *Missouri River Telegraph Co.* v. *First Nat. Bank*, 74 Ill. 217, which is the principal case relied upon by appellant, is in complete harmony with the above rule. It was there said: "It is manifest that this language confers no jurisdiction on any court in this State to try this case, for the obvious reason that the appellant's bank or association is not located in this State. The jurisdiction attempted to be conferred is only on the State courts, the county courts or municipal courts in the State in which the bank is situated. By the plain meaning of the language of this section, congress intended only to confer jurisdiction upon the State courts of Iowa, the county court of Woodbury county, and the municipal court of Sioux City, if they had jurisdiction of similar cases under the laws of that State. The effort to confer jurisdiction was not on such courts generally, but simply upon the courts in the jurisdiction in which the delinquent bank

might be located. The language is so plain that it will not admit of construction."

It appears that the court, in that case, declined to exercise jurisdiction for the reason that such jurisdiction was expressly denied to it by the Federal law. The refusal of the court to take jurisdiction was not, as argued, because it declined to enforce a Federal statute, penal in its nature.

The Emergency Price Control Act, as declared by Congress, is clearly a war-emergency measure. Its purpose was to stabilize economic conditions in the furtherance of the total war effort. The Congress having passed the act for the purpose of accomplishing a permissible end within its powers, it is not for the courts to speculate as to the wisdom of the means employed. The act is not vulnerable to any constitutional objection urged against it. The third defense was properly stricken and the second statement of error is not well taken.

This brings us to the third statement of error under which it is contended that the judgment should be reversed because the sales were made by appellant's agents, without its previous knowledge or subsequent approval. When the language of the act is considered, it seems to us little need be said in answer to this contention. The act is directed against "any person selling a commodity" in violation of a maximum price prescribed. (Section 205(e).) Section 302(h) (50 U. S. C. A. 942) defines the word "person" as used in the act, as including an "individual, corporation, partnership, association." By this language, Congress imposed the liability on every individual or corporation engaged in any business to which the act applies. Maximum prices, under the act, were to be established by regulations for the purposes declared therein. A right of action in the overcharged customer is one of the means provided for in the enforcement provisions of the act. A construction which would permit the enforcement of the act by

the means therein provided, only against subordinate employees, would be a narrow one, indeed.

It is true that no statute, penal in its nature, may be extended by construction. It is equally true that its meaning should not be distorted by such a narrow construction as to defeat its purpose.

In *People ex rel. Price* v. *Sheffield Farms,* 225 N. Y. 25, 121 N. E. 474, a similar question arose under a child labor law. The same defense was interposed. In refusing the application of the defense interposed, Judge Cardozo there said: "The personal duty rests on the employer to inquire into the conditions prevailing in his business. He does not rid himself of that duty because the extent of the business may preclude his personal supervision, and compel reliance on subordinates. He must then stand or fall with those whom he selects to act for him. He is in the same plight, if they are delinquent, as if he had failed to abate a nuisance on his land (*R.* v. *Stephen,* L. R. 1 Q. B. 702; *Tenement House Department, N. Y. City* v. *McDevitt,* 215 N. Y. 160, 167, 168, 109 N. E. 88, Ann. Cas. 1917A. 455;) or had failed to furnish a safe place to work. (Labor Law, par. 200.) It is not an instance of *respondeat superior.* It is the case of the nonperformance of a nondelegable duty. (*Hankins* v. *N. Y. L. E. & W. R. R. Co.* 142 N. Y. 416, 420, 37 N. E. 466, 25 L. R. A. 396, 40 Am. St. Rep. 616.) There are a host of other provisions in the Labor Law where the duty must be held personal, or we nullify the statute."

Appellant being a corporation, it could only act through its agents and employees. The corporation must "stand or fall with those whom it selects to act for it." Otherwise, the government would be compelled to look alone to subordinates, generally unknown and not infrequently irresponsible. (*State* v. *Louisville and Nashville Railroad Co.* 91 Tenn. 445, 19 S. W. 229.) This rule has been universally applied in cases involving the acts of agents of rail-

roads and corporations generally. A pertinent announcement is found in *United States* v. *Illinois Central Railroad Co.* 303 U. S. 239, 58 S. Ct. 533, where it was said: "As between the government and respondent, the latter's breach is precisely the same in kind and degree as it would have been if its yardmaster's failure had been intentional instead of merely negligent. The duty violated did not arise out of the relation of employer and employee but was one that, in virtue of the statute, was owed by respondent to the shippers and the public. As respondent could act only through employees, it is responsible for their failure. To hold carriers not liable for penalties where the violations of Secs. 1 and 2 are due to mere indifference, inadvertence or negligence of employees would defeat the purpose of Sec. 3. Whether respondent knowingly and wilfully failed is to be determined by the acts and omissions which characterize its violation of the statute and not upon any breach of duty owed to it by its employees. Respondent's contention that it is not liable because its failure was due to the negligence or oversight of the yardmaster cannot be sustained."

The declared purpose of the act is to stabilize prices and to prevent abnormal increases in prices and to eliminate and prevent "profiteering, hoarding, manipulation, speculation and other disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to the national emergency; to assure that defense appropriations are not dissipated by excessive prices; to protect persons with relatively fixed and limited incomes, consumers, wage earners, investors and persons dependent on life insurance, annuities and pensions, from undue impairment of their standard of living; to prevent hardships to persons engaged in business, to schools, universities, and other institutions, and to the Federal, State and local Governments, which would result from abnormal increases in prices; to assist in securing adequate production of com-

modities and facilities; to prevent a post emergency collapse of values; to stabilize agricultural prices in the manner provided in section 3, and to permit voluntary cooperation between the Government and producers, processors, and others, to accomplish the aforesaid purposes." Sec. 1, 50 U. S. C. A. 901.

In the declaration of this broad and comprehensive purpose, Congress could not have been unmindful of the fact that a large part of the retail business of this country, within the scope of the act, is carried on by corporations, many of which operate so-called chain stores. It could not have been the intention of Congress, by the language it used in the act, to accomplish its purpose by imposing the penalties provided only upon employees of the corporations, and not upon the corporations themselves except in cases where the acts of employees had been expressly authorized or approved by its corporate management in such a formal manner as to constitute technical corporate action. We cannot attribute such manifest impotency to the legislative branch of our government. Nor is it too much to impose upon corporate enterprises the duty to conduct business in conformity with the act, through its agents or employees, chosen for the purpose, whatever may be their relation to the corporation. The purpose of the act is to enforce compliance with its provisions, not to punish subordinate employees.

It is our conclusion that a corporation, subject to the provisions of the act, is liable for violations by those whom its selects as its representatives, in making sales. This is true regardless of the fact that such representatives are minor in character and have no official status in the corporation and no authority in the formation of its policies, and no voice in the adoption of its practices. In making sales in the line of their employment, such employees are the corporation itself. It can neither repudiate nor disown

the acts of its employees, engaged in transactions which they were employed to make.

In this instance it was the corporation which was engaged in business. It received the financial benefit of all excessive prices exacted from customers. It belonged to the class on which the restrictions of the act were imposed. It must stand or fall by the acts of those whom it voluntarily selected to represent it in the particular transactions here involved.

The final challenge to the judgment is the sufficiency of the evidence to support it. This contention raises an issue of fact which necessitates an examination of the pleadings, as well as the evidence. The parties are agreed that on April 28, 1942, the Administrator of the Office of Price Administration promulgated a general maximum price regulation, effective May 18, 1942. By such regulation a maximum or ceiling price was fixed, at which appellant could lawfully sell Campbell's Condensed Asparagus Soup, at retail, to consumers, at its store in Oak Park, Illinois.

In this class of cases when the informer receives the amount of any judgment that may be entered against the defendant, courts should scrutinize with care evidence given by such informer and if it appears that such evidence is affected by his own cupidity or desire to gain by the lawsuit, corroboration should be required. His relation to the action is not solely that of a party. He is a volunteer. On the trial plaintiff testified positively to the sales alleged to have been made on November 19 and December 11. He offered in evidence cash-register receipts showing such sales. Each of these receipts showed a sale of two cans of asparagus soup at twenty-five cents.

There was no direct denial of this testimony. The authenticity of the cash register receipts was not challenged. The evidence offered by appellant consisted of the testimony of its checker or cashier at its Oak Park store. She

had no recollection of making either sale to appellant; she denied, generally, making the overcharges alleged. Appellant's district manager and its manager of the store in question also testified. They testified generally as to the posting of ceiling prices in the store and to the giving of instructions to employees that such prices were to be observed. The manager also denied making the sales to appellant. Appellant's manager of its Chicago office also testified as to instructions sent by mail from his office to its various store managers in his district. His testimony was somewhat weakened by the fact that he was not definite as to whether appellant operated 210 or 215 stores in the Chicago area. Obviously, the testimony offered by appellant was wholly insufficient to overcome the positive testimony of plaintiff, concerning the particular sales, corroborated, as he was, by the cash-register receipts. On this record, we would not be justified in saying that the findings of the trial court on the facts were contrary to the weight of the evidence.

So far as we are advised by counsel, and our own investigation has disclosed, the validity of the Emergency Price Control Act of 1942 has not been passed upon by the Supreme Court of the United States, or by the highest court of any State. The absence of such decisions and the public importance of the questions involved, we trust, have justified us in this somewhat extended consideration of the questions raised and the arguments made.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

Mr. JUSTICE THOMPSON, dissenting:

As to that portion of the opinion which sustains the trial court on the propositions of law involved in this appeal I find no difficulty in concurring. On the question raised and argued by appellant that the judgment of the trial court is manifestly against the weight of the evidence,

I am thoroughly convinced that the record before us fails to sustain the judgment by a preponderance of the evidence.

The only evidence in support of plaintiff's claim is his own testimony. He testified to three purchases of Campbell's asparagus soup at prices above the ceiling fixed by the office of price administration. He testified that the first purchase was made November 19, 1942, of two cans of Campbell's asparagus soup for 25 cents. This purchase he claimed was made by him at defendant's store from a Mrs. Phillips. His second purchase, according to his testimony, was on December 11, 1942, and from whom he could not say, although defendant's evidence is clear and conclusive that only Mrs. Phillips and the manager of the store were employed there at that time. He had been trading at that store for 21 years; knew that Campbell's asparagus soup had been selling at three cans for 29 cents; and raised no protest nor said anything to Mrs. Phillips nor any one else at the time of his purchase about the price being too high. His counsel offered in support of his claim and corroborative of his testimony cash-register receipts, one bearing date November 19 and the other December 11, 1942. Each one contained at the top the words, "Consumer's Sanitary Coffee & Butter Stores," a space and then the date, followed by "0.25" and "Thank You, $00.25." In the space between the heading and the date there was written in plaintiff's handwriting the words and figures "2-asparagus soup." Both these cash-register receipts were objected to but the court admitted them in evidence. The third sale, to which he testified, was on December 14, 1942, at which time he claimed to have purchased three cans of Campbell's asparagus soup for 38 cents. The same kind of cash-register receipt bearing that date, with a similar heading with the figures 0.25 and 0.13 stamped thereon was followed by a space, beneath which were the words and figures stamped thereon, "Thank you, $00.38." In the space was written "3 asparagus soup"

which plaintiff testified was written by a clerk, a high-school girl whose name he did not know, who was working at the store. All these receipts were admitted but the third is eliminated from consideration because the trial court, on the positive proof that no such high-school girl was working there at that time, found in favor of defendant as to the third alleged purchase.

Clearly the two receipts of November 19 and December 11, were inadmissible as to the writing thereon and the objection should have been sustained to that extent. Admitted as they were they contained self-serving statements which tended to support the facts in dispute that plaintiff had purchased on those dates the two cans of asparagus soup on each occasion for 25 cents. Statements or declarations as to the act of a party in corroboration of his theory of the case or of any fact favorable to him, whether oral or in writing, are inadmissible in evidence on his own behalf except where they are a part of the *res gestae* or made in the presence of the opposing party. (*People* v. *Foster*, 288 Ill. 371, 378.) Here the writing "2-asparagus soup" was written on the receipts by plaintiff.

Since no error is assigned on the admission of those self-serving statements the case cannot be reversed for that error. But the probative value of these exhibits may be considered by this court in determining the alleged error that the judgment is manifestly against the weight of the evidence.

Two witnesses testified positively that they did not make the sales in question to plaintiff. The heading on the cash-register receipts was not that of defendant, The Kroger Grocery & Baking Company, and there was no showing that defendant was operating its store at 11 Harrison street, Oak Park, at the times in question as "Consumer's Sanitary Coffee & Butter Stores," the name shown on the receipts. Plaintiff was completely discredited as to the third alleged purchase and by the cash-register re-

ceipt he claimed to have received at that time, and the trial court found against him. The same two witnesses clearly contradicted him as to the first two purchases. The two employees were not shown to have any interest in the result of the suit while plaintiff stood to gain financially by his testimony. The exhibits were without probative value and plaintiff's testimony standing uncorroborated does not constitute a preponderance of the evidence, in view of the contradiction by oral testimony and circumstances connected with the series of alleged transactions.

Plaintiff admitted that he had been purchasing Campbell's asparagus soup for 3 cans for 29 cents and Campbell's chicken soup at 2 cans for 25 cents. Defendant's exhibit 3, ceiling price list, shows that those were the price ceilings set forth on the list. No list price was included for single cans nor for two cans of asparagus soup. Only three kinds of Campbell's soup were listed at 2 for 25 cents. They were bouillon, consomme, and chicken soup. There had never been any change in the selling price of Campbell's asparagus soup. Plaintiff claimed that he had been buying chicken soup but not at that time because it had all been closed out. It is improbable that plaintiff would have made the purchases with knowledge that the price was above the ceiling and made no complaint. The trial court properly held that he failed to prove by a preponderance of the evidence the third alleged purchase and according to my appraisal of the evidence the first two alleged purchases were as lacking as the third in sufficient credible evidential support. For these reasons it is my opinion the judgment should be reversed solely on the ground that the judgment is contrary to the manifest weight of the evidence.