**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**HILTON HOTELS CORPORATION
et al., Defendants,**

**Western International Hotels Company,
Defendant-Appellant.**

**No. 71-1379.**

United States Court of Appeals,
Ninth Circuit.

Sept. 26, 1972.

Certiorari Denied Jan. 15, 1973.
See 93 S.Ct. 938.

**1002**

Thomas M. Triplett (argued), A. Allan Franzke, of Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland, Or., for defendant-appellant.

Gregory B. Hovendon (argued), George Edelstein, Harry First, Richard W. McLaren, Asst. Atty. Gen., Washington, D. C., Sidney I. Lezak, U. S. Atty., Portland, Or., Marquis L. Smith, J. Frederick Malakoff, San Francisco, Cal., for plaintiff-appellee.

Before BROWNING, HUFSTEDLER, and TRASK, Circuit Judges.

BROWNING, Circuit Judge:

This is an appeal from a conviction under an indictment charging a violation of section 1 of the Sherman Act, 15 U. S.C. § 1.

Operators of hotels, restaurants, hotel and restaurant supply companies, and other businesses in Portland, Oregon, organized an association to attract conventions to their city. To finance the association, members were asked to make contributions in predetermined amounts. Companies selling supplies to hotels were asked to contribute an amount equal to one per cent of their sales to hotel members. To aid collections, hotel members, including appellant, agreed to give preferential treatment to suppliers who paid their assessments, and to curtail purchases from those who did not.

I

The jury was instructed that such an agreement by the hotel members, if proven, would be a per se violation of the Sherman Act. Appellant argues that this was error.

We need not explore the outer limits of the doctrine that joint refusals to deal constitute per se violations of the Act, for the conduct involved here was of the kind long held to be forbidden without more. "Throughout the history of the Sherman Act, the courts have had little difficulty in finding unreasonable restraints of trade in agreements among competitors, at any level of distribution, designed to coerce those subject to a boycott to accede to the action or inaction desired by the group or to exclude them from competition." Barber, Refusals to Deal under the Federal Antitrust Laws, 103 U.Pa.L.Rev. 847, 872–873 (1955); see also Report of the Attorney General's National Committee to Study the Antitrust Laws 133, 137 (1955). Familiar examples include United States v. General Motors Corp., 384 U.S. 127, 145–147, 86 S.Ct. 1321, 16 L.Ed. 2d 415 (1966); Klor's Inc. v. Broadway-Hale Stores, 359 U.S. 207, 211–212, 79 S. Ct. 705, 3 L.Ed.2d 741 (1959); Fashion Originators' Guild of America, Inc. v. FTC, 312 U.S. 457, 465, 61 S.Ct. 703, 85 L.Ed. 949 (1941); and Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 614, 34 S.Ct. 951, 58 L.Ed. 1490 (1914).

Appellant argues that in cases in which the per se rule has been applied to refusals to deal, the defendants intended "to destroy a competitor or a line of competition," while the purpose of the defendants in the present case "was solely to bring convention dollars into Portland." But the necessary and direct consequence of defendants' scheme was to deprive uncooperative suppliers of the opportunity to sell to defendant hotels in free and open competition with other suppliers, and to deprive defendant hotels of the opportunity to buy supplies from such suppliers in accordance with the individual judgment of each hotel, at prices and on terms and conditions of sale determined by free competition. Defendants therefore "intended" to impose these restraints upon competition in the only sense relevant here. See United States v. Griffith, 334 U.S. 100, 105–106, 68 S. Ct. 941, 92 L.Ed. 1236 (1948); United States v. Patten, 226 U.S. 525, 543, 33 S.Ct. 141, 57 L.Ed. 333 (1912). The ultimate objective defendants sought to achieve is immaterial. Klor's Inc. v.

Broadway-Hale Stores, *supra,* 359 U.S. at 211–213, 79 S.Ct. 705. *See also* Radiant Burners, Inc. v. Peoples Gas, Light & Coke Co., 364 U.S. 656, 659–660, 81 S.Ct. 365, 5 L.Ed.2d 358 (1960); and Fashion Originators' Guild v. FTC, *supra,* 312 U.S. at 466–467, 61 S.Ct. 703.

■ Running through appellant's argument is the theme that the suppliers complied with the urgings of the hotels to contribute because they wished to maintain friendly business relations with these important customers; that this sort of "coercion," and submission to it, is common in American business life, and should not be subject to the Sherman Act unless it is shown that in the particular case it was intended to have, or had, an unreasonable impact upon price, quality, or service.

If the argument is that the evidence did not show an agreement on the part of the hotels to prefer suppliers who paid their contribution over those who did not, we reject it on the ground that the evidence was clearly sufficient to establish such an agreement. If the argument is that such use by the defendant hotels of their combined economic power to coerce suppliers violates the Sherman Act only if price, service, or quality is adversely affected, we reject it on the authority of Klor's Inc. v. Broadway-Hale Stores, *supra,* 359 U.S. at 212, 79 S.Ct. 705.

Appellant argues that since the suppliers were also members of the association, the per se rule is inapplicable because "the request for contribution and the alleged coercive action was among members of the same association" and the "implied threat of coercion or preference can be said simply to be an incidental effect of regulations within the group inter se."

■ The circumstance that both the boycotters and their victims were members of the same trade association would not diminish the impact of the boycott on competition, and appellant does not explain why it should affect the legality of the boycott. This same factual circumstance appears to have been present, for example, in Fashion Originators' Guild v. FTC, *supra,* 312 U.S. at 461, 61 S.Ct. 703.

■ The evidence does not show that the suppliers joined in the agreement that the hotels would cease dealing with those that failed to pay, but the result would not be changed if it had. It is not the primary purpose of the Sherman Act to protect deserving private persons, but to vindicate the public interest in a free market.[1] Northern Pacific Ry. v. United States, 356 U.S. 1, 4, 78 S.Ct. 514, 2 L.Ed.2d 545 (1956); D. R. Wilder Mfg. Co. v. Corn Products Refining Co., 236 U.S. 165, 174, 35 S.Ct. 398, 59 L.Ed. 520 (1915).

This is not a case in which joint activity having a primary purpose and direct effect of accomplishing a legitimate business objective is also alleged to have had an incidental and indirect adverse effect upon the business of some competitors. *See, for example,* Chicago Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); Bridge Corp. of America v. American Contract Bridge League, 428 F.2d 1365 (9th Cir. 1970); Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71 (9th Cir. 1960); Deesen v. Professional Golfers' Ass'n of America, 358 F.2d 165 (9th Cir. 1966).[2] The primary purpose and direct effect of defendants' agreement was to bring the combined economic power of the hotels to bear upon those

---

1. This is also a sufficient answer to appellant's objection to the court's instruction that a boycott would violate the Sherman Act "even if the boycott . . . resulted from a personal quarrel." *Cf.* Klor's Inc. v. Broadway-Hale Stores, 359 U.S. 207, 210, 79 S.Ct. 705, 3 L.Ed. 2d 741 (1959).

2. Of course, such conduct is not necessarily exonerated; its legality is tested under the "rule of reason." *See generally* Bird, Sherman Act Limitations on Noncommercial Concerted Refusals to Deal, 1970 Duke L.J. 247, 270–73 (1970).

suppliers who failed to pay. The exclusion of uncooperative suppliers from the portion of the market represented by the supply requirements of the defendant hotels was the object of the agreement, not merely its incidental consequence.

## II

Appellant's president testified that it would be contrary to the policy of the corporation for the manager of one of its hotels to condition purchases upon payment of a contribution to a local association by the supplier. The manager of appellant's Portland hotel and his assistant testified that it was the hotel's policy to purchase supplies solely on the basis of price, quality, and service. They also testified that on two occasions they told the hotel's purchasing agent that he was to take no part in the boycott. The purchasing agent confirmed the receipt of these instructions, but admitted that, despite them, he had threatened a supplier with loss of the hotel's business unless the supplier paid the association assessment. He testified that he violated his instructions because of anger and personal pique toward the individual representing the supplier. *See* note 1.

Based upon this testimony, appellant requested certain instructions bearing upon the criminal liability of a corporation for the unauthorized acts of its agents. These requests were rejected by the trial court. The court instructed the jury that a corporation is liable for the acts and statements of its agents "within the scope of their employment," defined to mean "in the corporation's behalf in performance of the agent's general line of work," including "not only that which has been authorized by the corporation, but also that which outsiders could reasonably assume the agent would have authority to do." The court added:

> "A corporation is responsible for acts and statements of its agents, done or made within the scope of their employment, even though their conduct may be contrary to their actual

instructions or contrary to the corporation's stated policies."

Appellant objects only to the court's concluding statement.

■■ Congress may constitutionally impose criminal liability upon a business entity for acts or omissions of its agents within the scope of their employment. United States v. A & P Trucking Co., 358 U.S. 121, 125–126, 79 S.Ct. 203, 3 L.Ed.2d 165 (1958); New York Central & Hudson R. R. Co. v. United States, 212 U.S. 481, 29 S.Ct. 304, 53 L.Ed. 613 (1909); *cf.* United States v. Illinois Central R. R. Co., 303 U.S. 239, 58 S.Ct. 533, 82 L.Ed. 773 (1938). Such liability may attach without proof that the conduct was within the agent's actual authority, and even though it may have been contrary to express instructions. United States v. American Radiator & Standard Sanitary Corp., 433 F.2d 174, 204–205 (3d Cir. 1970). *See also* New York Central & Hudson R. R. Co. v. United States, *supra*, 212 U.S. at 493, 29 S.Ct. 304; Standard Oil Co. v. United States, 307 F.2d 120, 127–128 (5th Cir. 1962); United States v. Armour & Co., 168 F.2d 342, 343–344 (3d Cir. 1947); Egan v. United States, 137 F.2d 369 (8th Cir. 1943); 10 Fletcher, Cyclopedia of the Law of Private Corporations 492 (M. Wolf ed. 1970).

■ The intention to impose such liability is sometimes express, New York Central & Hudson R. R. Co. v. United States, *supra*, 212 U.S. 481, 29 S.Ct. 304, 53 L.Ed. 613, but it may also be implied. The text of the Sherman Act does not expressly resolve the issue. For the reasons that follow, however, we think the construction of the Act that best achieves its purpose is that a corporation is liable for acts of its agents within the scope of their authority even when done against company orders.

It is obvious from the Sherman Act's language and subject matter that the Act is primarily concerned with the activities of business entities. The statute is directed against "restraint upon commercial competition in the marketing of

goods or services." Apex Hosiery Co. v. Leader, 310 U.S. 469, 495, 60 S.Ct. 982, 993, 84 L.Ed. 1311 (1940). In 1890, as now, the most significant commercial activity was conducted by corporate enterprises. *See* New York Central & Hudson R. R. Co. v. United States, *supra,* 212 U.S. at 495, 29 S.Ct. 304; Regan v. Kroger Grocery & Baking Co., 386 Ill. 284, 54 N.E.2d 210, 219 (S.C.Ill.1944).

Despite the fact that "the doctrine of corporate criminal responsibility for the acts of the officers was not well established in 1890", United States v. Wise, 370 U.S. 405, 408, 82 S.Ct. 1354, 1357, 8 L.Ed.2d 590 (1962), the Act expressly applies to corporate entities. 15 U.S.C. § 7. The preoccupation of Congress with corporate liability was only emphasized by the adoption in 1914 of section 14 of the Clayton Act to reaffirm and emphasize that such liability was not exclusive, and that corporate agents also were subject to punishment if they authorized, ordered, or participated in the acts constituting the violation. United States v. Wise, *supra,* 370 U.S. at 411–415, 82 S.Ct. 1354.

■ Criminal liability for the acts of agents is more readily imposed under a statute directed at the prohibited act itself, one that does not make specific intent an element of the offense. *See* Standard Oil Co. v. United States, *supra,* 307 F.2d at 125; *cf.* Empire Printing Co. v. Roden, 247 F.2d 8, 17 (9th Cir. 1957); Note, Corporate Criminal Liability for Acts in Violation of Company Policy, 50 Geo.L.J. 547, 562 (1962); Perkins on Criminal Law 638, 640 (2d ed. 1969). The Sherman Act is aimed at consequences. Specific intent is not an element of any offense under the Act except attempt to monopolize under section 2, and conscious wrongdoing is not an element of that offense. The Sherman Act is violated if "a restraint of trade or monopoly results as the consequence of a defendant's conduct or business arrangements." United States v. Griffith, *supra,* 334 U.S. 100, 105, 68 S.Ct. 941, 944, 92 L.Ed. 1236 (1948). *See* Whiting, Antitrust and the Corporate Executive, 47 Va.L.Rev. 929, 934 (1961); Developments in the Law— Criminal Conspiracy, 72 Harv.L.Rev. 920, 937 n. 94 (1959); Note, *supra,* 50 Geo.L.J. 547, 558 n. 61.

The breadth and critical character of the public interests protected by the Sherman Act, and the gravity of the threat to those interests that led to the enactment of the statute, support a construction holding business organizations accountable, as a general rule, for violations of the Act by their employees in the course of their businesses. In enacting the Sherman Act, "Congress was passing drastic legislation to remedy a threatening danger to the public welfare. . . ." United Mine Workers v. Coronado Coal Co., 259 U.S. 344, 392, 42 S.Ct. 570, 576, 66 L.Ed. 975 (1922). The statute "was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions." Northern Pacific Ry. v. United States, *supra,* 356 U.S. at 4, 78 S.Ct. at 517.

With such important public interests at stake, it is reasonable to assume that Congress intended to impose liability upon business entities for the acts of those to whom they choose to delegate the conduct of their affairs, thus stimulating a maximum effort by owners and managers to assure adherence by such agents to the requirements of the Act. *See* Note, *supra,* 50 Geo.L.J. 547, 558; Note, 60 Harv.L.Rev. 283, 285–286, 289 (1946). *See also* United States v. A. & P. Trucking Co., *supra,* 358 U.S. at 126, 79 S.Ct. 203; United States v. George F. Fish, Inc., 154 F.2d 798, 801 (2d Cir. 1946); United States v. Armour & Co., *supra,* 168 F.2d at 344; Regan v. Kro-

ger Grocery & Baking Co., *supra,* 386 Ill. 284, 54 N.E.2d at 220.

Legal commentators have argued forcefully that it is inappropriate and ineffective to impose criminal liability upon a corporation, as distinguished from the human agents who actually perform the unlawful acts (*see* Francis, Criminal Responsibility of the Corporation, 18 Ill.L.Rev. 305 (1924); Canfield, Corporate Responsibility for Crime, 14 Colum.L.Rev. 469 (1914)), particularly if the acts of the agents are unauthorized. *See* Mueller, Mens Rea and the Corporation, 19 U.Pitt.L.Rev. 21, 45 (1957). But it is the legislative judgment that controls, and "the great mass of legislation calling for corporate criminal liability suggests a widespread belief on the part of legislators that such liability is necessary to effectuate regulatory policy." ALI Model Penal Code, Comment on § 2.07, Tentative Draft No. 4, p. 149 (1956). Moreover, the strenuous efforts of corporate defendants to avoid conviction, particularly under the Sherman Act, strongly suggests that Congress is justified in its judgment that exposure of the corporate entity to potential conviction may provide a substantial spur to corporate action to prevent violations by employees. Note, *supra,* 60 Harv.L.Rev. 283, 286.

Because of the nature of Sherman Act offenses and the context in which they normally occur, the factors that militate against allowing a corporation to disown the criminal acts of its agents [3] apply with special force to Sherman Act violations.

Sherman Act violations are commercial offenses. They are usually motivated by a desire to enhance profits.[4]

They commonly involve large, complex, and highly decentralized corporate business enterprises, and intricate business processes, practices, and arrangements. More often than not they also involve basic policy decisions, and must be implemented over an extended period of time.

Complex business structures, characterized by decentralization and delegation of authority, commonly adopted by corporations for business purposes, make it difficult to identify the particular corporate agents responsible for Sherman Act violations. At the same time, it is generally true that high management officials, for whose conduct the corporate directors and stockholders are the most clearly responsible, are likely to have participated in the policy decisions underlying Sherman Act violations, or at least to have become aware of them.

Violations of the Sherman Act are a likely consequence of the pressure to maximize profits that is commonly imposed by corporate owners upon managing agents and, in turn, upon lesser employees. In the face of that pressure, generalized directions to obey the Sherman Act, with the probable effect of foregoing profits, are the least likely to be taken seriously. And if a violation of the Sherman Act occurs, the corporation, and not the individual agents, will have realized the profits from the illegal activity.

In sum, identification of the particular agents responsible for a Sherman Act violation is especially difficult, and their conviction and punishment is peculiarly ineffective as a deterrent. At the same time, conviction and punishment of the business entity itself is likely to be both appropriate and effective.

---

3. *See generally* Sutherland, White Collar Crime 53–54, 217–220, 229–233 (1949); ALI Model Penal Code Comment on § 207, Tentative Draft No. 4, 148–149 (1955); Watkins, Electrical Equipment Antitrust Cases—Their Implications for Government and for Business, 29 U.Chi. L.Rev. 97, 105–106 (1961); Comment, Criminal Prosecutions for Violations of the Sherman Act: In Search of a Policy, 48 Geo.L.J. 530, 538–541 (1965); Note, Corporate Criminal Liability for Acts in Violation of Company Policy, 50 Geo. L.J. 547, 552–554 (1962).

4. A purpose to benefit the corporation is necessary to bring the agent's acts within the scope of his employment. Standard Oil Co. v. United States, 307 F.2d 120, 128–129 (5th Cir. 1962).

For these reasons we conclude that as a general rule a corporation is liable under the Sherman Act for the acts of its agents in the scope of their employment, even though contrary to general corporate policy and express instructions to the agent.

 Thus the general policy statements of appellant's president were no defense. Nor was it enough that appellant's manager told the purchasing agent that he was not to participate in the boycott. The purchasing agent was authorized to buy all of appellant's supplies. Purchases were made on the basis of specifications, but the purchasing agent exercised complete authority as to source. He was in a unique position to add the corporation's buying power to the force of the boycott. Appellant could not gain exculpation by issuing general instructions without undertaking to enforce those instructions by means commensurate with the obvious risks.

### III

 Appellant filed two motions requesting disclosure of the grand jury transcript. The first sought production of the testimony of all of the witnesses who appeared before the grand jury, the second sought the testimony of appellant's past and present employees. Assuming the court erred in denying the motions, the error was harmless.

According to appellant, the grand jury testimony of four witnesses was involved. Appellant was given a transcript of the testimony of one of the witnesses a week prior to trial, and of another during the trial at the latest. Appellant has suggested no respect in which the delay between the making of the motions and the delivery of the transcript as to these two witnesses could have prejudiced its defense, and none is apparent.

The other two grand jury witnesses were former employees of appellant. Neither was called as a witness by either side. Government supplier witnesses did testify to statements made by these two employees that indicated a refusal to deal with suppliers who failed to pay association assessments. These witnesses were available for cross-examination, and presumably transcripts of their grand jury testimony had been made available to appellant a week prior to trial pursuant to the court's order applicable to all government witnesses.

The most that appellant could have learned from access to the grand jury testimony of its two employees was that they had denied making the statements attributed to them. One would suppose that appellant could discover this simply by asking the witnesses themselves; they would have no reason to deny it. Appellant informed the district court, however, that one of the employee witnesses, its former chef, had gone to Switzerland. Appellant's claim of prejudice rests finally upon this witness' absence.

Appellant did not represent to the trial court, nor to us, that it would have had the slightest difficulty locating the witness. So far as appears, it made no effort to contact him at all. All that appellant asserted to the trial court was that access to the witness' grand jury testimony would have enabled it to determine whether it would have been worth its while to make such an effort.

The witness' testimony could have consisted of no more than a denial of the statement attributed to him by the supplier witness. That statement was a relatively innocuous one. Certainly in the context of the whole record, it could not have influenced the verdict. Thus, even if denial of appellant's motion for a copy of the transcript of the witness' testimony were treated as tantamount to denying appellant the benefit of the witness' trial testimony, the error, if any, would be harmless. *See* Osborne v. United States, 371 F.2d 913, 919 (9th Cir. 1967); Ogden v. United States, 303 F. 2d 724, 740–741 (9th Cir. 1962); *cf.* Kotteakos v. United States, 328 U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

**1008**

IV

Appellant asserts that the evidence connecting appellant with the conspiracy was not sufficient.

The argument rests largely upon three erroneous premises of law.

The first is that because of the acquittal of appellant's manager, evidence connecting him with the conspiracy cannot be considered against appellant. Acts and statements of appellant's employees within the scope of their employment bind appellant. *See* Part II. It makes no difference whether such acts and statements are sufficient to convict the employee of participation in the conspiracy. A fortiori, it is irrelevant that the employee was charged with the offense and acquitted. United States v. American Stevedore, Inc., 310 F.2d 47, 48–49 (2d Cir. 1962); Magnolia Motor & Logging Co. v. United States, 264 F.2d 950, 953 (9th Cir. 1959); United States v. General Motors Corp., 121 F.2d 376, 411 (7th Cir. 1941); United States v. Austin-Bagley Corp., 31 F.2d 229, 233 (2d Cir. 1929).

Secondly, appellant erroneously asserts that the acts and statements of appellant's purchasing agent did not bind appellant because they were contrary to express instructions. *See* Part II.

Finally, appellant asks us to test the sufficiency of the evidence by inquiring whether "reasonable minds could find that the evidence excludes every reasonable hypothesis but that of guilt." Remmer v. United States, 205 F.2d 277, 288 (9th Cir. 1953). We specifically rejected this standard in United States v. Nelson, 419 F.2d 1237, 1243–1245 (9th Cir. 1969). The question is whether the fact-finder could reasonably conclude that defendant's guilt was free of the kind of doubt that would make a person hesitate to act in the more serious and important affairs of his life.

We have examined the government's evidence in light of this standard and conclude that it is sufficient.[5]

Affirmed.

---

5. We have also considered appellant's objections to the trial court's treatment of testimony regarding statements made by appellant's chef, at a time outside the period of the statute of limitations, and the court's instructions concerning illegal activities of an association originally organized for a proper purpose. We conclude that no reversible error occurred.