NORMAN H. ROBINSON *vs.* PRUDENZA NORATO.

JULY 25, 1945.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

CONDON, J. This is an action on the case brought by a tenant against his landlord for alleged overcharges of rent in violation of sec. 205 (e) of the federal emergency price control act of 1942, 50 U. S. C. A. App. §925 (e) and of regulations pursuant thereto governing the use and occupancy of housing accommodations in the city of Providence. Defendant demurred to the declaration in the superior court on several grounds, the principal one being that the statute on which the action is based is penal in its nature and therefore not cognizable, under the established law of Rhode Island, in the courts of this state. The superior court sustained the demurrer and plaintiff excepted to that decision. The case is here solely on that exception.

After the papers in the case were transmitted to this court, Chester Bowles, federal price administrator, requested permission to appear and file a brief as *amicus curiae*, which we granted. At the hearing before us the district enforcement attorney of the federal office of price administration for Rhode Island appeared for him and, with the consent of plaintiff's counsel, shared the time allotted to the plaintiff for oral argument. On plaintiff's side of the case we have thus had the benefit of two briefs and two oral arguments

which, we think, have thoroughly presented that side for our consideration. In our discussion of the contentions therein presented, we shall not distinguish who made them but shall refer to them as plaintiff's contentions. We shall also refer to the statute simply as the price control act.

Plaintiff contends that the decision of the superior court is erroneous because, first, the price control act is not a penal statute, in the international sense; second, even though it be deemed by this court to be such a statute, the courts of Rhode Island should nevertheless enforce it, since the United States and Rhode Island are not foreign to each other; and, third, regardless of the penal character of the statute and the relation of the state to the United States, the courts of Rhode Island are bound to enforce the statute, since, as a law of the United States, it is the supreme law of the land and the judges in every state are bound thereby. We shall consider those contentions in the above order.

The price control act was enacted by congress under its power to declare and wage war. *Yakus* v. *United States,* 321 U. S. 414; *Bowles* v. *Willingham,* 321 U. S. 503. The rent provisions of the act go to the very limit of that power if, indeed, they do not go beyond it. They constitute a direct interference with interests in realty and indirectly affect the incidents of tenure of land in the several states which heretofore have never been considered to be within the domain of federal power either in peace or in war. But whether or not such provisions are constitutional in this respect, the supreme court of the United States has not to our knowledge determined nor are we called upon to do so here. For the purposes of this case, therefore, constitutionality must be assumed.

In undertaking to make price control legislation apply to interests in realty, congress has declared that the renting of housing accommodations in "defense areas" shall be deemed the selling of a commodity and has subjected such renting transactions to the provisions of sec. 205 (e), which reads as follows: "If any person selling a commodity violates a regu-

lation, order, or price schedule prescribing a maximum price or maximum prices, the person who buys such commodity for use or consumption other than in the course of trade or business may bring an action either for $50 or for treble the amount by which the consideration exceeded the applicable maximum price, whichever is the greater, plus reasonable attorney's fees and costs as determined by the court. For the purposes of this section the payment or receipt of rent for defense-area housing accommodations shall be deemed the buying or selling of a commodity, as the case may be. If any person selling a commodity violates a regulation, order, or price schedule prescribing a maximum price or maximum prices, and the buyer is not entitled to bring suit or action under this subsection, the Administrator may bring such action under this subsection on behalf of the United States. Any suit or action under this subsection may be brought in any court of competent jurisdiction, and shall be instituted within one year after delivery is completed or rent is paid. . . . ."

The question of constitutional power in congress to confer such jurisdiction on state courts is not raised by defendant's demurrer. As we understand the defendant, he claims that the superior court is without jurisdiction over the subject matter of the case at bar, because the price control act is a penal statute in an international sense. However, if it is not such a penal statute, defendant does not deny that the superior court, as a court of general jurisdiction, is a court of competent jurisdiction within the meaning of the act.

Is this statute, under the established law of Rhode Island, a penal statute in an international sense? On the authority of the cases here we think that it must be so considered. *McLay* v. *Slade*, 48 R. I. 357; *O'Reilly* v. *N. Y. & N. E. R. Co.*, 16 R. I. 388. That the penal statutes of one state will not be enforced by the courts of another state is a rule of private international law, which is universally acknowledged and applied. *The Antelope*, 10 Wheat, 66, 123; *Wisconsin* v. *Pelican Ins. Co.*, 127 U. S. 265. But there has long been an ap-

parently irreconcilable divergence of view as to what is a penal statute in an international sense. The settled view of the supreme court of the United States appears to be that a statute is penal, in that sense, only if "its purpose is to punish an offense against the public justice of the State" rather than "to afford a private remedy to a person injured by a wrongful act." *Huntington* v. *Attrill,* 146 U. S. 657, 673.

Since that decision was handed down in 1892 many state courts have followed it and some, in order to do so, have overruled their own prior decisions, which had enunciated a different rule. *Wellman* v. *Mead,* 93 Vt. 322; *Daury* v. *Ferraro,* 108 Conn. 386, 143A. 630. But in the *McLay* case, *supra,* this court, although it was also urged to overrule its prior decision in the *O'Reilly* case, expressly declined to do so. In that case this court had held that, where a Massachusetts statute had for its object some punishment of the defendant, it was a penal statute, notwithstanding the fact that the penalty of not less than $500 to be recovered by a civil action inured to the benefit of certain persons designated by the statute and not to the state of Massachusetts. Such was the so-called broad view of a penal statute that was somewhat widely held in this country until the opinion in *Huntington* v. *Attrill, supra,* gave strong support to what is sometimes called the narrow view. The latter view has been briefly and well expressed by the New York court of appeals, speaking through Judge Cardozo, in *Loucks* v. *Standard Oil Co.,* 224 N. Y. 99, 102, wherein a penal statute in the international sense is defined as "one that awards a penalty to the state, or to a public officer in its behalf, or to a member of the public, suing in the interest of the whole community to redress a public wrong. The purpose must be, not reparation to one aggrieved, but vindication of the public justice."

On that view it may be that sec. 205 (e) is not a penal statute, but, in our opinion, there is no question that under the rule of the *O'Reilly* case it is such a statute. In that case this court held to be penal a Massachusetts statute which was less punitive than sec. 205 (e). The feature of a statute

which distinguishes it as penal, in the view of this court, is the imposition of some punishment upon the defendant for the violation of the law, regardless of whether the penalty is recoverable by a private person or not. This distinction was pointed out in *Gardner* v. *N. Y. & N. E. R. Co.*, 17 R. I. 790.

There a Connecticut statute that somewhat resembled the Massachusetts statute, which was involved in the *O'Reilly* case, in that it provided a remedy for damages to the person injured by its violation, was held to be not penal but remedial, because it provided for no recovery, by either the state or the injured person, of a penalty as punishment to the defendant for violating the statute. The court expressly stated that: "A penal statute is one by which some punishment is imposed for a violation of the law." And it pointed out that since, unlike the Massachusetts statute, none was provided for in the Connecticut statute, it was not penal but entirely remedial. The federal statute here not only provides for the recovery of a penalty by the person injured but also for the recovery of an identical penalty by the United States whenever the injured person is not entitled to bring suit himself. The case at bar is an action, under the statute, to recover the arbitrary sum of $50 for each violation of such statute, regardless of the actual damage suffered by the plaintiff. It, therefore, clearly comes within the rule of the *O'Reilly* case and is not cognizable in the courts of this state.

Plaintiff practically concedes that this conclusion is correct if the rule of the *O'Reilly* case is adhered to, but he argues that it should no longer be followed, first, because the rule of *Huntington* v. *Attrill, supra,* was substantially approved in *Kilton, Warren & Co.* v. *Providence Tool Co.,* 22 R. I. 605; second, because in the *McLay* case this court leaned heavily on certain Massachusetts cases and that state has since adopted the rule of the *Huntington* case, thereby weakening the *McLay* case as authority; and, third, that in any event we should overrule that case and the *O'Reilly* case.

The answer to the first contention is that it is without foundation. A careful reading of the opinion in the *Kilton,*

*Warren & Co.* case will show that this court was not considering whether the statute there involved was penal in an international sense. The question for decision was solely whether the statute was strictly penal so as to fall under the provisions of a special statute of limitations. In its discussion of the problem before it, the court was careful to say, at page 613 of the opinion: "That the effect of this statute is to impose a penalty upon the stockholder for the default of the corporation may be admitted." And then after quoting from the *Huntington* case as to the characteristics of a strictly penal statute, the court took the pains to state expressly: "It need hardly be said that this construction of chapter 288 is not a decision that the provisions of chapter 555, Public Laws, imposing special liabilities upon stockholders and officers of manufacturing corporations, in cases of non-performance of statutory duties, are not of a penal character." In other words, while the court held that the statute was not a strictly penal statute within the contemplation of the special statute of limitations, it was nevertheless a penal statute for other purposes.

The second contention is equally without merit. The context of the opinion in the *McLay* case shows that this court recognized and applied the well-established rule that the test of whether a statute is penal in an international sense is not what the legislature or the court of its home state says it is but what the court where it is sought to be enforced says it is. In its discussion of the Massachusetts cases this court, in the *McLay* case, did not say that those cases were controlling on the question whether the Massachusetts statute was to be deemed penal in its nature in Rhode Island.

Plaintiff's third contention that the *O'Reilly* and *McLay* cases ought to be overruled to bring Rhode Island into the general current of authority following *Huntington* v. *Attrill, supra,* is deserving of more extended discussion. We are not unmindful of the strong persuasive force of the opinion in that case, not only because of the intrinsic merit it may exhibit but also because of the tribunal from which it eman-

ates. We are, however, in this instance met with other considerations that make it unwise, in our opinion, to adopt that view. When, in 1918, the *McLay* case was argued to this court, it was then urged to overrule the *O'Reilly* case and adopt the rule of the *Huntington* case. It was pointed out to the court at that time that a number of state courts had thus overruled their own prior contrary decisions. Notwithstanding such argument the court expressed the opinion that no sufficient reason had been shown for such action and declined to overrule the *O'Reilly* case.

We are thus confronted with a firmly established rule of law in this state. To change that rule now would be merely to exchange one rule for another without achieving substantial improvement in the law. The reasons which are advanced to support the rule of the *Huntington* case are not, in our opinion, sufficiently cogent to justify so radical a reversal of the long-established law of this state.

In the long run we think that our view will, to an equal if not greater degree than the view expressed in the *Huntington* case, demonstrate its utility and wisdom. Under the *O'Reilly* case the court is given scope to refuse the aid of this state in enforcing foreign statutes which may appear on the surface to be remedial but are in reality drastically penal and are so intended to be in their home state. Section 205 (e) is itself an ideal illustration of the ease with which a statute that is almost wholly penal in its nature and intent may be classified as remedial under the rule of the *Huntington* case. It is possible under that section for a landlord, who may have overcharged a weekly tenant as trifling a sum as ten cents a week, to be mulcted in damages at the end of the year in the sum of $2600, plus attorney's fees and costs, although plaintiff's actual damages would be only $5.20 and costs. The $2600 would be, in reality, punishment for the violation of the statute, that is, not in any sense compensatory damages but purely an arbitrary penalty totally unrelated to the real injury suffered by the plaintiff.

Clearly the bringing of an action in such a case is induced

by the desire to recover the penalty and not merely to recover compensation. And it is equally clear that congress intended that the statute should operate in just that way in order to obtain for the office of price administration, as representing the public, the active assistance of aggrieved tenants in the enforcement of price controls in the public interest. "Congress foresaw that the task of enforcing the Act against retailers would be too vast for the Administrator to accomplish without the help of consumers. The plain purpose of the $50 clause is to enlist the help of consumers in discouraging violations." *Bowles* v. *American Stores,* 139 F. 2d 377, 379. In that same case the United States Court of Appeals for the District of Columbia attempted to distinguish sec. 205 (e) from sec. 205 (b), which, it said, was the only penal section, but it also said: "Section 205 (e) reflects the view that occasional hardship to one who honestly and intelligently endeavors to comply with the law is not too high a price to pay for the protection of the whole community against inflation." How could it be more forcibly stated that the primary purpose of that section is to secure the enforcement of the statute for the public welfare and only incidentally for the compensation of the injured person for the damage he has personally suffered by the violation of the statute?

Such a statute does not, in our opinion, afford an exclusively civil remedy as was stated in *Beasley* v. *Gottlieb,* 131 N. J. L. 117, 35 A. 2d 49, which is relied upon by the plaintiff. In that case the New Jersey court reached such result by relating the problem before it to the "national crisis" and then resorting to what it termed a "liberal construction" to construe the section as remedial in its nature rather than penal. For our part this seems a strained construction and we are not disposed to follow it. On the contrary, we are of the opinion that, regardless of the views of other state and federal courts, sec. 205 (e) must be construed to be, under the rule of construction which is the established law of this state, a penal statute in an international sense.

But the plaintiff argues that even though we deem the statute penal we nevertheless should entertain suits under it, because it is a law of the United States, and even more because, by the federal constitution we are bound to do so. He contends that the *O'Reilly* and *McLay* cases are without binding force unless, "1.) Congress intended a consumer action under Section 205 (e) to be a purely penal statute in the international sense; 2.) ·the Federal courts charged with the interpretation of federal acts have so held; and 3.) the Emergency Price Control Act is a statute of a foreign jurisdiction."

The short answer to 1.) is that the intention of congress is of no controlling importance. Nor, as to 2.), in the absence of a decision by the supreme court of the precise question before us, are the decisions of the inferior federal courts of any greater consequence. Whether a statute is penal in an international sense is a question exclusively for the court of the state where the statute is sought to be enforced. It was so stated in *Huntington* v. *Attrill, supra,* and is a universally accepted rule of private international law. The supreme court said in that case, at page 683: "If a suit on the original liability under the statute of one State is brought in a court of another State, the Constitution and laws of the United States have not authorized its decision upon such a question to be reviewed in this court."

The answer to 3.) requires a somewhat fuller discussion. It rests upon two basic contentions: that the United States and this state are not foreign to each other and that, under the supremacy clause of the federal constitution, Article VI, we are bound to enforce all laws of the United States whether we deem them penal or not. Plaintiff cites, in support of those contentions, *Claflin* v. *Houseman,* 93 U. S. 130, and more particularly what was said by the court in that case at page 136. We shall not quote all of that page here. A significant sentence is: "The United States is not a foreign sovereignty as regards the several states, but is a concurrent, and, within its jurisdiction, paramount sovereignty." And an-

other is: "Legal or equitable rights, acquired under either system of laws, *may* be enforced in any court of either sovereignty competent to hear and determine such kind of rights and *not restrained by its constitution in the exercise of such jurisdiction.*" (italics ours) The real pronouncement of the court can be correctly understood only if due weight is given to the meaning of the words which we have italicized. They indicate that there may be barriers set up by the states themselves to the enforcement of certain federal laws in the state courts. And there are other significant expressions in the opinion to a like effect.

In the sense of public international law, the several states of the Union are neither foreign to the United States nor are they foreign to each other. But such is not the case in the field of private international law. In only one respect does the federal constitution operate by way of compulsion on the states in that field and that is in requiring each state to give full faith and credit to the public acts, records and judicial proceedings of every other state. Art. IV. Before the adoption of the constitution, that obligation rested in comity. Where the constitution neither compels nor excludes jurisdiction, one state is free, and under the rule of comity ought, to entertain suits arising under the laws of the United States or of any other state, when its courts deem such laws to be civil and not penal in their nature.

We think that the state courts which have relied upon the language of the *Claflin* case have extended the scope of its meaning beyond what was intended by the supreme court when, in cases of private international law, they hold that they are bound by that case not to consider the laws of the United States as laws of a foreign jurisdiction. It is true that the supreme court in the *Second Employers' Liability Cases,* 223 U. S. 1, 57 and 59, uses language which seems to say so but nevertheless, even in those cases, we do not understand that court to hold that a state may not refuse to entertain suits arising under a law of the United States if the state court holds that such law is penal in its nature. Those cases

were not cases where the state court had held a federal statute before it to be penal but each was a case where the state court had refused to enforce the statute because it was contrary to the policy of the state.

The supreme court, while it held this to be error, was careful nevertheless to limit its opinion to the language of the case which came up before it from Connecticut as follows: "Because of some general observations in the opinion of the Supreme Court of Errors, and to the end that the remaining ground of decision advanced therein may be more accurately understood, we deem it well to observe that there is not here involved any attempt by Congress to enlarge or regulate the jurisdiction of state courts or to control or affect their modes of procedure, but only a question of the duty of such a court, *when its ordinary jurisdiction as prescribed by local laws is appropriate to the occasion and is invoked in conformity with those laws,* to take cognizance of an action to enforce a right of civil recovery arising under the act of Congress and susceptible of adjudication according to the prevailing rules of procedure. We say 'when its ordinary jurisdiction as prescribed by local laws is appropriate to the occasion,' because we are advised by the decisions of the Supreme Court of Errors that the Superior Courts of the State are courts of general jurisdiction, are empowered to take cognizance of actions to recover for personal injuries and for death, and are accustomed to exercise that jurisdiction, *not only in cases where the right of action arose under the laws of that State, but also in cases where it arose in another State,* under its laws, and in circumstances in which the laws of Connecticut give no right of recovery, as where the causal negligence was that of a fellow-servant." (italics ours) And again, at the end of the opinion, on page 59, it made that limitation clear as to all of the states when it said: "We conclude that rights arising under the act in question may be enforced, as of right, in the courts of the States when their

jurisdiction, *as prescribed by local laws,* is adequate to the occasion." (italics ours)

A brief review of some cases decided after as well as before the *Second Employers' Liability Cases* will show that the supreme court has not taken the extreme view contended for by the plaintiff here. In *Anglo-American Provision Co.* v. *Davis Provision Co.,* 191 U. S. 373, 374, it was said with reference to the supreme court of New York: "The Constitution does not require the State of New York to give jurisdiction to the Supreme Court against its will. If the plaintiff can find a court into which it has a right to come, then the effect of the judgment is fixed by the Constitution and the act in pursuance of it which Congress has passed. . . . But the Constitution does not require the State to provide such a court." Later, in *Chambers* v. *Baltimore & Ohio R. R. Co.,* 207 U. S. 142, 148, the court held that "subject to the restrictions of the Federal Constitution, the State may determine the limits of the jurisdiction of its courts, and the character of the controversies which shall be heard in them."

Sometime after the *Second Employers' Liability Cases* had been decided the supreme court again had occasion to discuss the relation of the states to the United States and said, in *Minneapolis & St. Louis R. Co.* v. *Bombolis,* 241 U. S. 211, 222, 223, "courts of both the Nation and the several States" are "not to be strange or foreign to each other in the *broad sense of that word . . . .*" (italics ours) In that case the court made it plain that only when such suits are within the scope of the jurisdiction conferred by the government creating them, is it the duty of state courts to entertain suits under the laws of the United States.

Still later in *Kenney* v. *Supreme Lodge,* 252 U. S. 411, 414, it was expressly said that a state was not required to furnish a court for such purpose, although there were limits to its power of exclusion. In that case the court held that the state of Illinois could not refuse to entertain suit on a judgment obtained in another state, notwithstanding that under the

law of the state it might have refused to entertain a suit on the original cause of action.

Another case in which the question of the right to sue on the federal employers' liability act in a state court was involved is *Douglas* v. *N. Y., N. H. & H. R. R. Co.*, 279 U. S. 377. There, at page 387, the supreme court said: "As to the grant of jurisdiction in the Employers' Liability Act, that statute does not purport to require State Courts to entertain suits arising under it, but only to empower them to do so, so far as the authority of the United States is concerned. It may very well be that if the Supreme Court of New York were given no discretion, being otherwise competent, it would be subject to a duty. But there is nothing in the Act of Congress that purports to force a duty upon such Courts as against an otherwise valid excuse."

Subsequent to the decisions in the *Douglas* and *Chambers* cases, the supreme court held, in *Miles* v. *Illinois Central R. Co.*, 315 U. S. 698, that Tennessee courts could not enjoin a resident of that state from bringing suit on the federal employers' liability act in a state court in Missouri for damages for an accident which happened on the defendant's railroad in Tennessee. But the court expressly recognized the soundness of the *Douglas* and *Chambers* cases. In the course of its opinion the court said Missouri was bound to take jurisdiction of the case, although that particular problem was not raised for its determination. One of the majority, *Jackson, J.*, the court having divided five to four on the question actually before it, disagreed with the opinion in that respect, saying, at page 708: "I do not, however, agree with the statement in Mr. Justice Reed's opinion that 'the Missouri court here involved must permit this litigation.' It is very doubtful if any requirement can be spelled out of the Federal Constitution that a state must furnish a forum for a nonresident plaintiff and a foreign corporation to fight out issues imported from another state where the cause of action arose."

On this particular question the following statement from the dissenting opinion of Mr. Justice Frankfurter seems to

us consistent with what the court itself has said in prior cases: "The availability of state courts for the enforcement of federal rights has not resulted in putting federal rights on any different footing from state rights. 'A state may not discriminate against rights arising under federal laws,' *McKnett* v. *St. Louis & S. F. Ry. Co., supra,* at 234, but neither the Constitution nor Congress has compelled the states to discriminate in favor of federal rights."

That it is the settled view of the supreme court that, on questions of private international law, the states are foreign to the United States would seem to be clear from the decision in *Wisconsin* v. *Pelican Ins. Co.,* 127 U. S. 265. In that case Wisconsin, on a judgment obtained in one of her courts against a Louisiana corporation, brought suit in the United States supreme court. On the theory that Wisconsin was a foreign state and that the suit was founded upon a penal statute, the court held that it would not entertain the suit to enforce that statute, saying, at page 289 of the opinion: "By the law of England and the United States, the penal laws of a country do not reach beyond its own territory, except when extended by express treaty or statute to offences committed abroad by its own citizens; and they must be administered in its own courts only, and cannot be enforced by the courts of another country." That case has been frequently cited by the supreme court and never has it been qualified in any manner. Mr. Justice Gray, who wrote that opinion, later wrote the opinion in *Huntington* v. *Attrill, supra,* wherein he referred to the holding in *Wisconsin* v. *Pelican Ins. Co.,* and, at page 672, said: "Upon similar grounds, the courts of a State cannot be compelled to take jurisdiction of a suit to recover a like penalty for a violation of a law of the United States."

This last statement is difficult to reconcile with the final contention of the plaintiff in the instant case that the courts of the several states are bound to entertain suits arising under the laws of the United States regardless of their character. He cites numerous cases from state courts which he

claims have adopted such a view as a result of their understanding of the scope of the opinions in *Claflin* v. *Houseman, supra,* and *Second Employers' Liability Cases, supra.* The more important of those state cases are *Lapinski* v. *Copacino,* 38 A. 2d (Conn.) 592; *Miller* v. *Municipal Court,* 22 Cal. 2d 818 and *Regan* v. *Kroger Grocery Co.,* 386 Ill. 284.

The Connecticut court held in the *Lapinski* case that it was bound to entertain an action under sec. 205 (e) regardless of what view it took of the section, because the supreme court had said in the *Second Employers' Liability Cases* that it was the duty of the Connecticut courts to enforce the policy of the United States. Apparently, it assumed that that section did not differ from the federal employers' liability act and that the policy of the United States declared by sec. 205 (e), even though it was penal, was, therefore, also entitled to be enforced. Under the broad interpretation which the Connecticut supreme court of errors has given to a statute of another state which provides punishment for the violator of such statute, as well as compensation for the person injured, that was probably the only conclusion to which it could logically come without discriminating against a law of the United States. In our opinion, however, if that court took the view which this court takes of penal statutes of foreign jurisdictions, it could well have differentiated between a case under sec. 205 (e) for the penalty therein provided and one under the federal employers' liability act purely for compensation to an injured employee.

The California and Illinois courts, in the *Miller* and *Regan* cases respectively, frankly avow their conviction that the United States cannot be deemed a foreign jurisdiction, and they rely in great part for such conviction upon the supremacy clause of the federal constitution. But we think that the purpose of that clause was merely to declare the supremacy of the federal constitution and acts of congress and treaties made in pursuance thereof, whenever the constitutions or laws of the several states came in conflict therewith and that, in such instances, the judges in each state were bound

to give effect to the federal law or treaty rather than the law of their own state. It was never intended to be the means by which congress could compel a state to provide, at its own expense, courts for the enforcement of federal laws which such state deemed to be penal and, therefore, unenforceable in its courts.

Of course there is no difficulty if a state court holds, as did California and Illinois, that even in private international law the United States and the states of the union are not foreign to each other. Where that view is held, however, discrimination in favor of rights arising under a federal law as against those arising under a similar law of a sister state might well result. For example, if we were to follow that view in the instant case, we would be granting a forum for the enforcement of a right under a federal statute that we deem to be penal, whereas we refuse to enforce a similar right under a penal statute of our sister state of Massachusetts. Such discrimination is precisely what Mr. Justice Frankfurter, in *Miles* v. *Illinois Central R. Co., supra,* said the federal constitution did not compel.

No decision by the United States supreme court has been cited to us, nor have we been able to find any, which unequivocally lays down the law as broadly as have those state courts. Until that court speaks more definitely on this precise question, we are not disposed to accept the conclusions of the state courts above mentioned.

It seems to us that this question has become somewhat confused. Instead of it being a question of what the states are *obligated* to do in furnishing a forum for litigating rights under a penal law of the United States, it is more properly a question of what congress *may* do, under the constitution, in conferring jurisdiction over such litigation upon the state courts. In the early years of the republic there was a conflict of opinion over the right of the state courts to entertain any jurisdiction over such litigation, even when Congress expressly conferred it.

An early case arising in a state court which illustrates a

phase of this conflict of opinion is the New York case of *United States* v. *Lathrop,* 17 Johns. 4. In that case the United States sued in the state court to recover a penalty for the violation of a federal statute by the defendant in selling liquor without a federal license. The action was debt. Defendant filed a plea to the jurisdiction based on the ground that an action did not lie in the state court for a federal penalty. The United States demurred to the plea. At the outset of its opinion overruling the demurrer and sustaining the plea, the New York supreme court said: "The plea demurred to, can only be supported on the ground, that by the constitution of the United States, no state court *can take cognizance* of any writ in behalf of the United States, for penalties or forfeitures." (italics ours)

The question there was, apparently, one of the capacity of the state court to take federal jurisdiction and not of any constitutional obligation upon such a court to do so. The act of congress provided that suits for recovery of the penalty could be prosecuted in any state court having jurisdiction of like cases. The court, while recognizing the competency, not the duty, of the state court to hear and determine all cases of a civil nature over which it had jurisdiction prior to the adoption of the constitution, held that as to crimes and offenses cognizable under the authority of the United States and in cases of suits for penalties and forfeitures incurred under the laws of the United States, the state courts were without power to entertain such proceedings. Its decision is summed up in the last sentence of its opinion, at page 10: "In whatever light, then, this question is considered, I am fully of the opinion, that this Court has no jurisdiction of the criminal offences, or penal laws of the United States; and that it is not competent to Congress to confer jurisdiction; and that, therefore, the defendant must have judgment on the demurrer."

One judge dissented in that case, not, however, on the ground that the state court *must* assume the jurisdiction conferred by congress,—in that matter he agreed with the ma-

jority that such imposition of jurisdiction on state courts by congress would violate fundamental principles,—but on the ground that congress had the power to confer such jurisdiction, and that it was optional with the state courts to assume it or not as they chose. His statement with reference to the enforcement by state courts of penal statutes of the United States is worthy of quotation for sound reason, if not for its authority: "Congress cannot *compel* a state court to entertain such a suit. If they had said, *imperatively,* that state courts shall hold cognizance in such cases, then, indeed, the question would have arisen, whether they had a right to constitute us the organ of judicial power for the United States? In the present case, I do not understand them as intending such an absurdity. . . . If a state has no organs of judicial power adapted to such a case, or if a state court refuse to hold cognizance in such a suit, then the provision in the act of Congress becomes nugatory, and the remedy must be had in the federal court." And he continues, at page 21 of the opinion: "In regard to the distinction between civil actions founded on penal statutes, and actions on contracts, the law and usage of nations *impose no obligation* on one sovereign to afford a remedy to enforce a *penal law* of another sovereign; and it is optional for the former to do it or not, according to his own convenience." Such was the reasoning of one who favored taking jurisdiction of a federal penal statute, not because of a constitutional duty to do so but because of the intimate relation of the states to the United States and their common interest in giving effect to the laws of the union, which he thought made it "fit and expedient to afford the remedy of a *civil action,* to enforce *this penal statute* of the United States."

The supremacy clause of the federal constitution cannot, in our opinion, be legitimately construed to compel state courts to take jurisdiction and enforce such penal statutes. On that score such statutes of the several states and the United States stand upon an equal footing. They are to be enforced or not enforced according to the rule of comity in

private international law and not by reason of any constitutional mandate. Except as to the full faith and credit clause, the constitution is silent on this subject. Each state is free to decide what statutes of another jurisdiction are penal and, therefore, unenforceable in its courts, provided, however, that as to the states of the union and the United States, it may not discriminate in favor of state laws and against the laws of the United States.

To summarize our position, we hold that, in the consideration of a statute like the one before us, this court has the right and authority to determine its character before allowing it to be enforced in the courts of this state; that if we find it to be penal we may refuse to enforce it regardless of its federal origin; and that the federal constitution does not require us to treat the United States in a matter of this nature more favorably than we do a sister state of the union. The contrary view would make the state courts, *nolens volens,* in effect, inferior federal courts to enforce *all* federal statutes, whenever congress so declares.

The plaintiff's exception is, therefore, overruled, and the case is remitted to the superior court for further proceedings.

*Francis A. Kelleher* for plaintiff.

*Ambrose W. Carroll,* district enforcement officer, *William B. Sleigh, Jr.,* regional litigation attorney, on behalf of Chester Bowles, administrator, office of price administration, *amicus curiae.*

*Philip B. Goldberg, Leo M. Goldberg, Goldberg & Goldberg,* for defendant.