ARTURO F. ARMSTRONG, Plaintiff and Appellee, v. MARÍA EMILIA ARMSTRONG DEL VALLE ET AL., Defendants and Appellants.

No. 144. Decided May 11, 1962.

388

*Orlando J. Antonsanti* and *Alberto J. Torruella* for appellants. *Antonio Zapater Cajigas* for appellee.

MR. JUSTICE RIGAU delivered the opinion of the Court.

The question presented is whether a will executed outside of Puerto Rico by a person not a citizen of Puerto Rico and in the execution of which the forms and solemnities of the country of execution were observed, is valid in Puerto Rico, and particularly in this case, for the purposes of passing title to real property situated in this country. The question does not involve the substantive or intrinsic requirements of the document but rather its formalities. The issue is not whether the provisions of the will violate our substantive law of succession.

■ Plaintiff Arturo F. Armstrong brought an action in the Superior Court, Ponce Part, praying for the annulment

of a will executed in New York by his deceased grandmother, Emilia Villaronga widow of Armstrong. He also prays for the annulment of a codicil written by hand by the testatrix which was also executed in New York.

There is no controversy as to the facts. Emilia Villaronga widow of Armstrong was born in Puerto Rico in 1875, and died in New York in 1957, where she resided since 1910. There, in New York, she formally executed a will in 1934. The only children of the deceased testatrix were Carlos G. Armstrong Villaronga and María Emilia Armstrong Villaronga. The former, who died in 1931, had two children: Carlos José, who died in 1936 without leaving descendants, and Arturo, the plaintiff herein. The latter, María Emilia Armstrong Villaronga, is living and her only child is Eduardo del Valle, both of whom are codefendants herein. In March 1957, the defendants filed a proceeding before the Superior Court, Ponce Part, to protocolize the will in question and the codicil. In the codicil the testatrix designated codefendant Eduardo del Valle her testamentary executor. Judgment was rendered in said proceeding granting the petition filed by the petitioners therein, and the two documents were protocolized by public deed.

Plaintiff alleged that the will was void because it was written in the English language only. He also challenged the validity of the codicil. The trial court sustained the complaint and rendered judgment declaring void the will and the codicil and imposed on the defendants the costs of the litigation and the sum of $800 for attorney's fees. As a conclusion of law, the trial court determined that the testatrix was a citizen of New York on the date the will was executed and on the date of her death. The parties accept this conclusion.

The defendants-appellants assign the following two errors: (1) that the trial court erred in holding that the will

was void because it was executed in English only, and (2) in holding that the codicil is void because it purported to complement a void will.

In order to declare the will void, the trial court relied on § 633 of the Civil Code, 31 L.P.R.A. § 2149, which we transcribe verbatim shortly hereinafter. The laws of the State of New York do not require that the wills executed in English in that state be also drafted in Spanish.[1] The Puerto Rican legislation embodied in the chapter of Book 3 of the Civil Code devoted to wills, contains a provision on this point, § 633, *supra*. That section provided [2] as follows on the date of the death of the testatrix:

"For the executing of a will in any other language besides Spanish or English, the presence of two interpreters shall be necessary, who shall be selected by the testator, and shall translate his provision into Spanish or English. The will shall be written in both languages, that is, the language of the testator and either English or Spanish. The same shall be understood when the will written in English is to be effective in whole or in part in Puerto Rico and in cases when a will written in Spanish is to be effective in whole or in part in the United States."

The conflict between the laws of the State of New York and those of the Commonwealth of Puerto Rico having been thus posed, we ask ourselves: Have our laws foreseen this situation of possible conflicts of laws on this matter? Does our legislation contain provisions in this respect? Should this will be governed, as to its formalities, by the law of Puerto Rico or by the law of New York?

▆▆▆ Upon an examination of the law we shall see why the first error was committed. Section 633, *supra*, 31 L.P.R.A. § 2149, which makes reference to the two languages,

---

[1] See § 2, Decedent Estate Law, 13 McKinney's Consolidated Laws of New York Annotated, §§ 10–48.

[2] Section 633 was amended by Act No. 92 of June 24, 1958 (Sess. Laws, p. 201), 31 L.P.R.A. § 2149, Supp. The amendment does not apply to the case at bar.

refers to wills executed in Puerto Rico. That section appears in Subchapter III [3] of Chapter 217, which is the chapter in the Civil Code devoted to wills. This subchapter deals with the "Form of Wills." [4] As to wills executed *outside* of Puerto Rico, the Code had already prescribed in the pertinent part of § 11, that "the forms and solemnities of contracts, wills and other public instruments are governed by the laws of the country in which they are executed." [5] Going back to Chapter 217 dealing with wills, in its Subchapter VII entitled "Will Made Outside Puerto Rico" there appears § 666, 31 L.P.R.A. § 2221, which provides in its pertinent part that "citizens of Puerto Rico may make wills abroad, according to the forms established by the laws of the country in which they are sojourning." This section harmonizes perfectly with § 11, *supra*. The Code having provided in detail in Chapter 217, Subchapter III, for the *form* of wills, it is natural that it should clarify (in its § 666) that, as respects the wills executed outside of Puerto Rico, the Puerto Rican citizens may make a will according to the forms established by the laws of the country in which they are sojourning. In this manner an interpretation which would conflict with § 11 of the same Code is avoided. Thus, for example, when the Code in Subchapter II of Chapter 217,

---

[3] We wish to clarify that the *subchapters* in Title 31 of L.P.R.A. (which comprises the Civil Code) are equivalent to the *sections* in the 1930 edition of the Code, and that the *sections* in L.P.R.A. are equivalent to the *sections* of the 1930 edition of the Code, 31 L.P.R.A. § 1, History.

[4] Section 633 is adopted from the Spanish § 684. Both the proper logic and the arrangement of the Civil Code and a reading of the commentators and the amendment introduced in 1958, convince us that this section (before and after the amendment) refers solely to wills executed in Puerto Rico. See V-1 PUIG PEÑA, *Tratado de Derecho Civil Español* 178-81; III DE DIEGO, *Instituciones de Derecho Civil* 95 and 103; III DE GASPERI, *Derecho Hereditario* 311-13.

[5] This section and other sections which appear in the preliminary provisions of the Civil Code embody rules of policy which place in their correct perspective other provisions contained further on in that legal corpus. They help one to see the forest in spite of the trees.

§ 618 (31 L.P.R.A. § 2123) *prohibits* joint wills, later in Subchapter VII, which deals with wills made outside of Puerto Rico, the Code in its § 667 (31 L.P.R.A. § 2222) repeats, by way of clarification, that a mutual will which the citizens of Puerto Rico execute abroad shall not be valid in Puerto Rico, even though the laws of the country where it has been executed authorize it. The said § 667 is an exception to § § 666 and 11 (*locus regit actum*) which, as we have seen, are in harmony with each other. *Colón* v. *Registrar*, 67 P.R.R. 16, 21 (1947). Naturally, the Code had nothing to provide in § 666 on the formalities to be observed by foreigners when testating abroad. The Civil Code is a harmonious legal body which must be read as a whole; its provisions cannot be interpreted isolatedly.

It is natural that our Code should provide in detail for the formalities of the wills executed in Puerto Rico, but not so as to those executed in foreign countries or jurisdictions. As Professor VALVERDE properly points out, the wills executed abroad are not subject, as to their formalities, to the detailed regulation of the Civil Code, because in that aspect they are subject to private international law.[6]

It is fitting to mention now, before proceeding any further, something on terminology. For the purposes of private international law, those jurisdictions having their own laws on certain matters, whose laws may be in conflict with each other, are considered foreign among themselves, even though those jurisdictions are not necessarily foreign for the purposes of public international law. This is so in the case of federally organized countries, such as, with natural differences, the United States, Switzerland, Canada, and Australia, as well as in the case of unitarian countries which, as in the case of Spain, the different regions of which they

---

[6] 5 VALVERDE, *Tratado de Derecho Civil Español* 119 (4th ed. 1939). See, also, 5 MANRESA, *Código Civil Español* 674 (6th ed.)

are composed preserved their regional private legislation. Those legislations, called state legislations (in North America) and statutory legislations (in Spain), give rise to collisions of laws which require the adjustments afforded by private international law, also called conflict of laws.[7] The same is true, of course, of the legislations of those countries which are foreign among themselves also in the light of public international law.

■ The Western law has comprised traditionally two great norms as to the law which should govern the formalities of juridical acts. As a general rule, the civil law sanctions the norm embodied in § 11 of our Civil Code (the law of the country in which the act is executed), known as *lex loci actus* and also as *locus regit actum*. The Anglo-Saxon common law recognizes several rules, but, in general, it may be said that, as respects successions, the other great rule to which we refer governs, that is, the rule of *lex rei sitae*, according to which the formalities of wills are governed by the law of the country where the real property is situated.[8] These concepts are closely related to the well-known doctrine of the Statutes of private international law, a doctrine which has given rise to a profuse and interesting literature in all countries. We need not repeat here expositions which may be found in the text writers.[9]

---

[7] I-1 CASTÁN, *Derecho Civil Español, Común y Foral* 435–65 (9th ed. 1955); K. C. WHEARE, *Federal Government* 1–34 (Oxford University Press, 1946); *Robinson v. Norato*, 43 A.2d 467, 162 A.L.R. 362, 368 (1945); *McFarland v. McFarland*, 19 S.E.2d 77, 82 (1942); *Hanley v. Donoghue*, 116 U.S. 1, 29 L. Ed. 535, 536 (1885); *Stewart v. Thompson*, 31 S.W. 133, 135 (1895).

[8] 4 RABEL, *The Conflict of Laws: A Comparative Study* 289 (1958); NUSSBAUM, *Principles of Private International Law* 148 (1943); Restatement of Conflict of Laws, §§ 249 and 306; GOODRICH, *Conflict of Laws* 514 (1949); Annot., 169 A.L.R. 554 (1947).

[9] For a resumé in the Spanish language, see I-1 CASTÁN, *Derecho Civil Español, Común y Foral* 417–65 (9th ed. 1955); for a resumé in English on the conflicts of American law, see CHEATHAM, *American Theories of Conflict of Laws: Their Role and Utility*, 58 Harv. L. Rev. 361 (1945); on the statutory and contemporaneous doctrines on the problem, see

NUSSBAUM points out that the common law is moving towards the rule of *locus regit actum*.[10] RABEL comments. that it is gratifying to see that the common law has been enriched by accepting the rule of the effectiveness of the law of the place of execution, and points out that a great majority of the American states have already incorporated, through legislation, that rule [11] into their own statutes. The same author states that the tendency is toward an optional opera- tion of the law of the place of execution or of the law of the domicile or nationality of the executing party at the time of execution.[12] In the United States the Model Execution of Wills Act sanctions the rule of *locus regit actum*, and also. recognizes the validity of the will executed in accordance with the law in force in the domicile of the testator at the time

I, MIAJA, *Derecho Internacional Privado*, Ch. I, (2d ed. 1956) ; for a dis- cussion of the rule of *locus regit actum*, see MIAJA, *op. cit.*, Vol. II, at 187–97 (1955) ; YANGUAS, *Derecho Internacional Privado* 281–92, General Part (2d ed. 1958), and 2 GOLDSCHMIDT, *Sistema y Filosofía del Derecho Internacional Privado* 199–255 (2d ed. 1954) ; on the specific problem of conflicts of law as to the formalities of wills, see Chapter 67, entitled "The Form of Wills" in the outstanding work of RABEL, cited in foot- note 8, Vol. 4, at 287–318; the same author in *The Form of Wills*, 6 Vand. L. Rev. 533 (1953) ; and LORENZEN, *The Validity of Wills, Deeds and Contracts as Regards Form in the Conflict of Laws*, 20 Yale L. J. 427 (1911).

The problems of private international law have frequently aroused the interest of lawyers and law scholars in Puerto Rico. Among others,. see GUAROA VELÁZQUEZ, *Directivas Fundamentales del Derecho Interna- cional Privado Puertorriqueño* (U.P.R. 1945) ; LINO SALDAÑA, 15 *Revista Jurídica de la Universidad de Puerto Rico* 77 (1945) ; note by the same author in the same volume at p. 315, and another in Vol. 17 at 366 (1948) of the same review; SALVADOR CASELLAS, *El Estatuto Real y el Testamento Otorgado Fuera de Puerto Rico*, 20 Rev. C. Abo. P.R. 307 (1960) ; MIRABAL. CONDE, *La Regla Lex Rei Sitae: La Doctrina Puertorriqueña de Conflictos de Leyes*, 30 Rev. Jur. U.P.R. 57 (1961) ; HERNÁNDEZ, *Jurisprudencia del Tribunal Supremo de Puerto Rico en Materia de Derecho Internacional Privado*, 6 Rev. Jur. U.P.R. 147 (1937).

[10] *Op. cit.* at 148–49.

[11] Article cited in 6 Vand. L. Rev. 533, 542. See, also, LORENZEN, 20 Yale L. J. 432.

[12] Article *supra* at 544.

of testating.[13] Referring to the Model Act, NUSSBAUM classifies it as "a remarkable piece of sound and progressive legislation."[14] It is well to clarify that the State of New York has incorporated in its legislation a provision similar to that of the Model Act and, therefore, it has expressly adopted the rule of *locus regit actum*.[15]

The authors are agreed that the modern tendency, in the civil as well as in the common law, of accepting almost universally the rule of *locus regit actum*, is due to the fact that that rule is the most fair, convenient, and practical one. For example, NUSSBAUM explains that the modern theory justifies that rule for considerations of convenience, which are particularly evident in the case of a will. Obviously, he says, for a person making a will in a foreign country it is easy to comply with the formalities of the law of that country, whereas it might be most extremely difficult, if not impossible, for such person to execute the will in strict compliance with his national law.[16] Conversely, it would also be very difficult and impossible at times for a foreign citizen who testates in his country and who has real property in other countries to comply with the formalities of the law of those other countries. We can well imagine the difficulty which a person would have to encounter if he has to testate in the United States or in England and must comply with the requirements of form prescribed by our legislation. In this connection, says YANGUAS:[17]

---

[13] Model Execution of Wills Act, § 7, 9A Uniform Laws Annotated 347 (1957). This Model Act was approved in 1940 by the National Conference of Commissioners on Uniform Laws and by the American Bar Association. That Model Act substitutes the Uniform Wills Act, Foreign Executed of 1910.

[14] *Op. cit.* at 149.

[15] Section 2, Decedent Estate Law, 13 McKINNEY's Consolidated Laws of New York Annotated, § 22ª; *In re Crandall*, 75 N.Y.S.2d 565 (1947); *In re Wizelholc's Estate*, 26 N.Y.S.2d 586 (1941).

[16] *Op. cit.* at 150.

[17] *Op. cit.* at 284.

"The most generalized theory and which in my opinion is more to the point, seeks the foundation of the rule in reasons of a practical nature. The rule of *locus regis actum* grew out of necessity, and it has universally spread and become rooted because its application facilitates the performance of juridical acts, guarantees their veracity, and locates the means of proof. It is useful, in any event, because it offers to the parties the possibility of resorting to the form established in a law which is within their immediate reach. It is necessary on certain occasions because the nationality of the contracting parties is diverse, or because there is no institution or indispensable means in the place for complying with the formality provided in the national law, such as would be the case if a public deed were required in England, where there are no notaries."

MIAJA,[18] GOLDSCHMIDT,[19] and MANRESA [20] share the same view.

Another consideration which has encouraged the adoption by so many jurisdictions of the liberal rule embodied in the said Model Act,[21] is that the law having emerged from its formalistic primitive stage, frustration of the will of the testators is not favored except for clear reasons of law or public policy. Naturally, the necessity of certain formalities in these acts is recognized, but the intolerance which existed on these questions has yielded.[22]

Having examined our positive law and the rule, let us examine the pertinent case law. The trial court relies on the case of *García* v. *De Jesús*, 79 P.R.R. 139 (1956), in support of its interpretation of § 633, 31 L.P.R.A. § 2149, in the sense that, if the will is going to transfer an interest in real

---

[18] *Op. cit.*, Vol. 2 at 190.

[19] *Op. cit.*, Vol. 2 at 200, 202.

[20] *Op. cit.*, Vol. 1 at 179.

[21] "A will executed outside this state in a manner prescribed by this Act, or a written will executed outside this state in a manner prescribed by the law of the place of its execution or by the law of the testator's domicile at the time of its execution, shall have the same force and effect in this state as if executed in this state in compliance with the provisions of this Act." Model Execution of Wills Act, 9A U.L.A., § 7.

[22] IV RABEL, *The Conflict of Laws* 287–88 and 297 (1958).

property in Puerto Rico, it is indispensable that it be written in two languages, English and Spanish. In the first place, the situation of facts in the *García* case is not the same as that in the case at bar. In the *García* case the will, although executed outside of Puerto Rico, complied with the formal requirements of the law of Puerto Rico as well as of the law of the place of execution, and, naturally, it was declared sufficient to pass title to real property situated in Puerto Rico (at 142). Hence, that case did not raise or decide the question presented in the instant case of Armstrong, where the requirements of form provided by the law of the place of execution (New York) were met, but not those required by the law of Puerto Rico. Moreover, from a reading of pages 141 and 142 of the *García* case, it may be clearly seen that there we insinuated that we did not agree that the rule of *lex rei sitae* prevails in Puerto Rico as to the formalities of the documents, and all the authorities cited in footnote 1 (at 141), favor the rule of *locus regit actum*.

We are confronted, however, with the case of *Melón* v. *Entidad Provincia Religiosa,* decided by the Court of Appeals, First Circuit, 189 F.2d 163 (1951), which presented the problem now under consideration: whether it is necessary that a will executed outside of Puerto Rico comply with the formal requirements provided by the law of Puerto Rico if such will is to pass title to real property situated in this country. In that case the Court of Appeals, in the first place, stated correctly, that the interpretation of the provisions of our Civil Code was of the competence of the Supreme Court of Puerto Rico and looked to our decisions for guidance. In construing the law, it arrived at the conclusion that, despite the express provision of § 11 of the Civil Code, the rule of *lex rei sitae* as to the forms and solemnities to be observed in the execution of wills made outside of Puerto Rico which pass an interest to real property situated here, has been adopted in Puerto Rico. In support of its conclusion, that court cited

the cases of *Colón et al.* v. *Registar*, 22 P.R.R. 344 (1915) ; *Bracons* v. *Registrar*, 24 P.R.R. 703 (1917), and *Pastor* v. *Miró*, 34 P.R.R. 50 (1925). Construing that those cases established in Puerto Rico the rule of *lex rei sitae*, for the purposes stated, and turning to the definition of that rule in *Restatement*,[23] the court reached the conclusion already stated and, for reasons of formalities, declared void the will of Pantaleona Melón Sáenz, executed in Barcelona, in pursuance of the law of that place.

It is therefore necessary that we re-examine those cases. In the case of *Colón* v. *Registrar*, *supra*, the only question presented was the legal capacity of the parties: that is, whether the tutor of Spanish minors residing in Spain could cancel a mortgage on certain real property situated in Puerto Rico without obtaining the authorization of a competent court in Puerto Rico, pursuant to the pertinent provisions of the Civil Code. Section 10 of the Civil Code, as amended, was applied and it was held that, "as regards contracts and agreements made with respect thereto and the rights of inheritance," real property must be regulated by the law of the country in which they are situated. It cited the case of *Amadeo* v. *Registrar*, 3 P.R.R. 263 (2d ed. 1903), where the problem presented was the capacity of the parties. This case did not render ineffective § 11 of the Civil Code.

In *Bracons* v. *Registrar*, *supra*, the problem dealt with the substantive law governing succession, with amount of property. It was necessary to decide whether the law governing the hereditary rights of the party was that of Cataluña or of Puerto Rico. It was held that the law of Puerto Rico prevailed. Nothing was decided in this case as to the formalities to be observed in a will executed in Spain. However, we believe that this case lends itself to confusion because, by way of dictum, it was said at p. 707 that "this court

---

[23] *Restatement of Conflict of Laws*, § 249.

clearly outlined its course by deciding to apply unqualifiedly the American theory in Porto Rico; that is, that the *lex rei sitae* is the rule which should be followed in determining the legal capacity of the parties in transactions involving real property." It is possible that the word "unqualifiedly" used therein was responsible for the interpretation that has been given to this case.

In *Pastor* v. *Miró, supra,* the testator, Amador Pastor y Pastor, a Spanish subject residing in Puerto Rico, executed an open will in Ponce in 1909, designating as sole heir Bartolomé Pastor Gomila. In 1917 the testator went to Spain, where he died three months later. Subsequent to the execution of the will, Don Amador wrote a letter in which he said: "My will is made on my death it should go to Pepito because I do not wish ..." The person referred to as Pepito was José Miró Pastor. In two other letters don Amador also made vague reference in that respect. After the death of Don Amador, José brought proceedings in a Spanish court requesting that those letters be declared the will of the deceased and he (José) his sole heir. The trial court of Lonja de la Palma, in Balearic Islands, granted the petition, holding that said letters were a sufficient will for protocolization purposes, without prejudice to third persons, and the said letters were protocolized in the office of a notary of that city.

An action having been brought in Puerto Rico between Bartolomé Pastor and José Miró Pastor, this Court concluded that in accordance with § 698 of the Civil Code (1902 ed.),[24] the letters should have been protocolized in Puerto Rico, which was the last domicile of the testator, and that, "... in any event, the said letter contains no will ..." because "... the words contained in the letter which the appellant claims to be a holographic will and in the letters of alleged ratification, have not the character of a will because, being casual remarks contained in long business and personal letters, they

---

[24] Equivalent to § 639 of the Civil Code (1930 ed.), 31 L.P.R.A. § 2163.

do not show the deliberate intention of the writer to arrange for the disposal of his property after his death, which is an essential requisite in wills."

It is plain that this case did not actually present the problem of forms and solemnities which should have been observed in the execution of Don Amador's will. It upheld the will executed in Ponce and did not admit the letters for two reasons, one, because they were not protocolized as required by the Civil Code, and because it was shown that the same did not contain a testamentary provision; they did not show the deliberate intention of disposing of the property after the death, which is an essential and substantive requirement of a document purported to be a will. But this case has presented difficulties in connection with § 11 of the Civil Code because it repeats the dictum in the *Colón* case as follows:

"*But even supposing* that he went to Spain to reside there permanently during the balance of his life and that for this reason his last domicile was in Spain, still the decision of the Court of First Instance of Palma declaring the said letters to be the holographic will of Amador Pastor y Pastor and ordering that they be protocoled in a notarial office in that city can produce no effect in this Island where the real property is situated, because, as held by this court in the case of *Colón* v. *Registrar*, 22 P.R.R. 344, the adoption and application of the rule of *lex rei sitae* as held by the American courts to include and govern the capacity of the parties does no violence either to the letter or to the spirit of our Civil Code or to any of its fundamental principles and establishes once for all a single, fixed and rational rule conducive to the avoidance of inconsistencies and confusion in our decisions referring to real and personal statutes and the effect of foreign laws; and applying the said doctrine in that case we held that a Spanish tutor of minors residing in Spain, authorized by the family council, as required by the Spanish Civil Code, to execute the cancellation of a mortgage upon real estate situated in Porto Rico, needed for that purpose authorization of the district court within whose jurisdiction the property was situated." (Italics ours.)

The decision in *Melón* v. *Entidad Provincia Religiosa* was severely criticized in the comments of PHANOS J. EDER, appearing in 1 American Journal of Comparative Law 123 (1952). It is said there that there is nothing in the cases cited to uphold the opinion in the sense that the laws of Puerto Rico had applied the rule of *lex rei sitae* to the forms and solemnities of wills, and that the decision flies in the face of the principle of *locus regit actum* expressly adopted in § 11 of the Civil Code of Puerto Rico.

Conscious of our *dicta* in the decisions of *Colón* v. *Registrar, supra,* and *Pastor* v. *Miró, supra,* we are able to understand the interpretation given in *Melón* v. *Entidad Provincia Religiosa, supra,* to those cases, but we believe that the *Melón* case does not state correctly the rule in force in Puerto Rico. Such rule is the one embodied in § 11 of our Civil Code.

We may add that the *Melón* case did not examine other cases of this Court which lead to a contrary conclusion. In *Rojas, Randall & Co., Inc.* v. *Registrar of Guayama,* 27 P.R.R. 20 (1919), an instrument was executed in New York whereby a certain real property situated in Puerto Rico was sold, and there we said:

"This being an instrument executed in New York conveying title to real property situated in Porto Rico, sections 10 and 11 of the Civil Code are applicable; and the former provides that real property is subject to the laws of the country in which it is situated, *while the latter provides that the forms and solemnities of contracts, wills and other public instruments are governed by the laws of the country in which they are executed.*" (Italics ours.)

In *Negrón* v. *Registrar,* 34 P.R.R. 753 (1925), we also upheld a deed executed in New York pursuant to the formalities required in that state and reversed the decision of the registrar appealed from. In *Vilella* v. *Registrar,* 36 P.R.R. 714 (1927), a will was executed in Madrid and the executor sold certain properties situated in Puerto Rico. The registrar refused to record and we reversed his decision on several

grounds, number 4 of which is pertinent here, and to that effect we said at p. 721:

"It seems to be contended in the fourth ground that the courts of Porto Rico should have intervened to pass on the validity and authenticity of the will because it had been executed by the testator abroad. *In accordance with section 11 of the Civil Code, which provides that the forms and solemnities of wills are governed by the laws of the country where they have been made,* such judicial intervention to establish its validity is not required." (Italics ours.)

In *Esteves* v. *Registrar*, 43 P.R.R. 6 (1932), we upheld the registrar's note in which he pointed out the defect in a power of attorney executed in France, consisting in the failure of the French notary to certify to the personal knowledge of the grantor or of two witnesses known to the notary. What we said on that occasion at p. 9, was: "Without a showing of what the laws of France are, section 11 of the Civil Code can not avail the appellant. It is not incumbent on the registrar to show that the laws are different, but the registrant should show what these laws are." This is not the situation in the case at bar.

In *Rosado* v. *Registrar*, 48 P.R.R. 539 (1935), a mortgage contract was executed in New York and the registration thereof refused by the registrar. In ordering the record thereof, we cited the cases of *Negrón* v. *Registrar* and *Rojas, Randall & Co., Inc.* v. *Reg. of Guayama, supra,* and once again we repeated at p. 540:

"There is no doubt that according to section 10 of the Civil Code real property is subject to the laws of the country in which it is situated, and *that according to section 11 of the same code, the form and solemnities of contracts, wills, and other public instruments are governed by the laws of the country in which they are executed,* unless they be authenticated by diplomatic or consular officers of the United States abroad, in which case the formalities established for their execution by the laws of the United States shall be observed." (Italics ours.)

In *Colón* v. *Registrar*, 67 P.R.R. 16 (1947), which we have already mentioned, we did not accept a joint will executed abroad on the ground that those wills were contrary to public policy, and in *García* v. *De Jesús*, 79 P.R.R. 139 (1956), as we have explained above, the problem in the case at bar was neither raised nor decided.

In applying § 11 as we have done, we are conscious of the limitations of the provisions of the Civil Code dealing with private international law. Those limitations, however, are not only present in the Puerto Rican Code, but they exist in connection with other European and South American codes which follow the civil-law tradition and which, naturally, have inherited the virtues and, in this case, the pitfalls of that tradition. Although those provisions did contribute progressive solutions for their time,, today they can be improved. The scarcity of legislation on private international law in civil-law countries and in common-law countries is pointed out by the commentators.[25] There are gaps in the rules of conflict of our Code, and it is to be expected that, in view of the increasing commercial traffic between Puerto Rico and the United States, problems involving conflicts of laws will arise and it might be necessary to cope with them by developing our private international law either through legislation or court decisions.[26] We also bear in mind that in applying the juridical rule, or in creating it, it is necessary to consider the social and economic reality to which it is applied, a reality

---

[25] See, for example, NUSSBAUM, *op. cit.* at 44–45; CASTÁN, *op. cit.*, Vol. 1, Part 1, at 463; MIAJA, *op. cit.*, Vol. 1, at 119–21.

[26] See CASTÁN, *La Formulación Judicial del Derecho* 143–60 (1954); CARDOZO, *The Nature of the Judicial Process*, Ch. III, at 98–141 (1921); RECASENS SICHES, *Vida Humana, Sociedad y Derecho* 321 (2d ed. 1945). RABEL invites attention in the sense that " . . . the impressive interest in conflicts law ... be devoted ... to the discovery of the desirable solution ... " See article of that author, *Comparative Conflicts of Law*, Spanish version, 19 Rev. Jur. U.P.R. 157, 168 (1950); English version in 24 *Ind. L. J.* 353 (1949).

which SAUER calls "the subsoil of the case." [27]    However, and bearing in mind these considerations, the law of Puerto Rico on the question presented in this case is the rule embodied in § 11 of the Civil Code.   Moreover, as we have already explained, that rule seems to be a good norm of private international law.

The second error was not committed.   The formalities required by the law of the place of execution were not observed in the execution of the codicil and the same is void. It was not signed in the presence of two witnesses nor was it signed by the two witnesses required by law.[28]

In view of the foregoing reasons, the judgment of the Superior Court, Ponce Part, rendered in this case on April 6, 1959, will be modified reversing the pronouncement of that court to the effect that the will is void, and it is affirmed insofar as it declared that the codicil is invalid.   The award of costs and attorney's fees on the defendants will also be reversed.

---

[27] SAUER, *Filosofía Jurídica y Social* 31 (Spanish translation by Legaz, 1933).

[28] Decedent Estate Law, §§ 2 and 21, 13 MCKINNEY's Consolidated Laws of New York Annotated; *In re Foster's Will*, 90 N.Y.S.2d 892 (1949).